**ALLSTATE INSURANCE COMPANY,
Petitioner,**

v.

**Stephen PARFREY and Deborah
Parfrey, Respondents.**

**No. 91SC147.**

Supreme Court of Colorado,
En Banc.

April 20, 1992.

Zupkus & Ayd, P.C., Robert A. Zupkus,
Greg Van Der Wey, Denver, and Sonnen-
schein Nath & Rosenthal, Jeffrey Lennard

and Catherine A. Van Horn, Chicago, Ill., for petitioner.

Salmon, Godsman & Nicholson, P.C., David I. Levy, Englewood, for respondent.

Wilcox, Ogden & Cox, P.C., Ralph Ogden, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Justice QUINN delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Parfrey v. Allstate Ins. Co.*, 815 P.2d 959 (Colo.App.1991), which reversed a summary judgment in favor of Allstate Insurance Company (Allstate) and remanded the case for further proceedings on the complaint of Steven and Deborah Parfrey against Allstate for its alleged negligence in failing to offer the Parfreys, in accordance with the requirements of section 10–4–609(2), 4A C.R.S. (1987), optional uninsured/underinsured motorist (UM/UIM) coverage at a level higher than the minimum statutory liability limits of $25,000 per person and $50,000 per accident. The court of appeals held that section 10–4–609(2) imposes a statutory duty on an insurer "to offer UM/UIM optional coverage in definite and specific terms so as to allow the consumer to make an intelligent decision regarding whether to accept or reject this coverage" and that the breach of this duty creates a private cause of action in the insured. 815 P.2d at 962, 966. The court also construed subsections 10–4–609(2) and (3), 4A C.R.S. (1987), to require an insurer to make a new offer of UM/UIM coverage at a level higher than the minimum statutory automobile liability coverage whenever an insured makes a "material change" in a policy, such as increasing liability limits or adding a new vehicle to the policy. *Id.* at 964. Finally, the court of appeals held that there were disputed issues of material fact on whether Allstate breached its statutory duty when the Parfreys purchased their initial bodily injury liability policy and also when the Parfreys increased their liability coverage and added another vehicle to their existing liability policy and that, therefore, the trial court erred in entering summary judgment

in favor of Allstate. *Id.* at 962, 964. Although we do not totally agree with the court of appeals' construction of section 10–4–609 with respect to an insurer's statutory duty to offer higher UM/UIM coverage, we do agree with the court of appeals' holding that the statute creates a private cause of action for the benefit of an insured and that summary judgment was improperly entered in favor of Allstate under the factual circumstances of this case. We accordingly affirm the judgment and remand the case for further proceedings in the trial court.

## I.

The statutory scheme for insurance protection against injuries and damages caused by uninsured and underinsured motorists provides the legal framework for resolving the issues before us. We, therefore, outline the applicable legislation before summarizing the facts underlying the legal issues before us.

### A.

Legislation relating to uninsured motorist coverage was originally enacted in 1965 and was designed to "assure the widespread availability to the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists." Ch. 91, sec. 1, 1965 Colo. Sess.Laws 333. In 1983 the statutory scheme was amended to provide that uninsured motorist coverage shall also "include coverage for damage for bodily injury or death which an insured is legally entitled to collect from the owner or driver of an *underinsured* motor vehicle." Ch. 92, sec. 1, § 10–4–609, 1983 Colo.Sess.Laws 454 (now codified at § 10–4–609(4), 4A C.R.S. (1987)) (emphasis added). An underinsured motor vehicle is defined in section 10–4–609(4), 4A C.R.S. (1987), as follows:

An underinsured motor vehicle is a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident, but the limits of liability for bodily injury or death under such insurance or bonds are:

(a) Less than the limits for uninsured motorist coverage under the insured's policy; or

(b) Reduced by payments to persons other than an insured in the accident to less than the limits of uninsured motorist coverage under the insured's policy.

The duties of an automobile liability insurer with respect to UM/UIM coverage are set forth in subsections (1), (2), and (3) of section 10–4–609, 4A C.R.S. (1987), and are as follows:

(1) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 42–7–103(2), C.R.S., under provisions approved by the commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; except that the named insured may reject such coverage in writing.

(2) Prior to the time the policy is issued or renewed, the insurer shall offer the named insured the right to obtain higher limits of uninsured motorist coverage in accordance with its rating plan and rules, but in no event shall the insurer be required to provide limits higher than the insured's bodily injury liability limits or one hundred thousand dollars per person and three hundred thousand dollars per accident, whichever is less.

(3) Notwithstanding the provisions of subsection (2) of this section, after selection of limits by the insured or the exercise of the option not to purchase the coverages described in this section, no insurer nor any affiliated insurer shall be required to notify any policyholder in any renewal or replacement policy, as to the availability of such coverage or optional limits. However, the insured may, subject to the limitations expressed in this section, make a written request for additional coverage or coverage more extensive than that provided on a prior policy.

Section 42–7–103(2), 17 C.R.S. (1984), to which subsection 10–4–609(1) expressly refers, defines an "automobile liability policy" as a liability policy, exclusive of interests and costs, of not less than $25,000 per person and $50,000 per accident. The Colorado Auto Accident Reparations Act also requires that any automobile liability insurance policy contain minimum legal liability coverage for bodily injury or death, exclusive of interest and costs, of $25,000 per person and $50,000 per accident. § 10–4–706(1)(a), 4A C.R.S. (1987).

The term "renewal policy," which appears in subsection (3) of section 10–4–609, is defined as "the issuance and delivery by an insurer of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of the policy beyond its policy period or term." § 10–4–601(3), 4A C.R.S. (1987).[1] A replacement policy is not defined by the applicable legislation. Pursuant to section 10–4–609(5), 4A C.R.S. (1987), the maximum liability of an insurer for UM/UIM coverage is the lesser of:

(a) The difference between the limit of uninsured motorist coverage and the amount paid to the insured by or for any

---

**1.** Section 10–4–601(3), 4A C.R.S. (1987), further states:

[A]ny policy with a policy period or term of less than six months shall, for the purpose of this part 6, be considered as if written for a policy period or term of six months; and any policy written for a term longer than one year, or any policy with no fixed expiration date, shall, for the purpose of this part 6, be considered as if written for successive policy periods or terms of one year, and such policy may be terminated at the expiration of any annual period upon giving twenty days' notice of cancellation prior to such anniversary date, and such cancellation shall not be subject to any other provision of this part 6.

person or organization who may be held legally liable for the bodily injury; or

(b) The amount of damages sustained, but not recovered.

### B.

On approximately March 8, 1985, Steven and Deborah Parfrey purchased an Allstate automobile liability insurance policy through an Allstate agent, Robert Townsend. The Allstate policy covered two vehicles, a Volkswagen owned by the Parfreys and a Toyota which they were leasing. The policy provided minimum bodily injury liability coverage of $25,000 per person and $50,000 per occurrence and also provided UM/UIM coverage at the same limits. Mrs. Parfrey stated in her deposition that the Allstate agent, when he issued the initial policy, mentioned different levels of UM/UIM coverage but did not explain any of the details concerning the coverage. The Allstate agent, on the other hand, testified in his deposition that it was his custom to present all his customers with a pamphlet which explained UM/UIM coverage, liability coverage, and no-fault coverage. Mrs. Parfrey could not recall whether she received the pamphlet from the Allstate agent.

Later in the month, on approximately March 16, 1985, the Parfreys increased their liability coverage to $50,000 per person and $100,000 per accident. A few months later the Parfreys learned that the lessor of the Toyota vehicle required higher liability limits so they increased their bodily injury liability coverage to $100,000 per person and $300,000 per accident.

Although the increases in liability coverage made the Parfreys eligible for higher UM/UIM coverage, neither Mrs. Parfrey nor the Allstate agent recalled discussing UM/UIM coverage on either of these occasions. The Allstate agent, however, stated in his deposition that it would have been his usual practice to notify an insured of the right to purchase UM/UIM coverage up to the limits of bodily injury liability coverage. At any rate, although the increases in the Parfreys' bodily injury liability coverage made them eligible to increase their UM/ UIM coverage, their UM/UIM coverage remained at the initial level of $25,000 per person and $50,000 per accident.

A six-month premium renewal notice was sent to the Parfreys in July 1985. The record, however, does not show whether the Parfreys at that time were provided with information advising them of their right to increase their UM/UIM coverage. In November 1985 the Parfreys added a 1967 Ford truck to their policy. Although the Allstate agent did not recall whether UM/UIM coverage was discussed with the Parfreys at this time, he stated that it would have been his practice to offer to the insured higher UM/UIM coverage on such an occasion. In January of 1986 another six-month premium renewal notice was sent to the Parfreys, but once again the record does not establish that the Parfreys received any information about their right to increase their UM/UIM coverage.

On October 30, 1986, Steven Parfrey, while driving the 1967 Ford truck, was involved in an automobile accident with an underinsured motorist whose bodily injury liability limits were $25,000 per person. Steven Parfrey settled his claim with the underinsured motorist for the $25,000 bodily injury limit.

In June 1988 the Parfreys filed a civil action in tort against Allstate. The Parfreys alleged that Allstate was negligent in not allowing them the right to obtain higher UM/UIM coverage as required by section 10–4–609(2) and that as a result of Allstate's negligence, they were not adequately compensated for the injuries and damages resulting from Stephen Parfrey's accident with an underinsured motorist. Allstate filed an answer in which it alleged that the complaint failed to state a claim for relief. After the pleadings were closed, Allstate filed a motion for summary judgment on the following grounds: that section 10–4–609(2) does not create a private cause of action in an insured based on an insurer's failure to offer an insured the right to obtain higher UM/UIM coverage; that Allstate was not required to offer the Parfreys higher UM/UIM coverage when the Parfreys purchased their initial policy

because at that time the Parfreys' UM/UIM coverage was equal to the bodily injury liability limits of $25,000 per person and $50,000 per accident; and that Allstate was not required to inform the Parfreys of any right to obtain higher UM/UIM coverage when the Parfreys increased their bodily injury liability limits or when they added another vehicle to their policy. The trial court granted Allstate's motion for summary judgment, ruling that Allstate had fulfilled its statutory duty by initially offering the Parfreys the minimum UM/UIM coverage of $25,000 per person and $50,000 per accident and that Allstate was under no obligation to subsequently notify the Parfreys of any right to increase their UM/UIM coverage.

The Parfreys appealed to the court of appeals, which reversed the summary judgment and remanded the case to the trial court for further proceedings. Fundamental to the Parfreys' appeal was the question regarding their right to file a private cause of action against Allstate. The court of appeals, addressing this issue last, held that section 10–4–609(2) provides an insured with a private cause of action in negligence against an insurer for violation of the statutory duty to offer an insured the right to obtain higher UM/UIM coverage. 815 P.2d at 966. The court of appeals also concluded that the statutory scheme is designed to require an insurer to inform an insured in definite and specific terms of the right to purchase UM/UIM coverage so as to allow the insured the opportunity "to make an intelligent decision regarding whether to accept or reject this coverage." Id. at 962. In addition, the court of appeals was of the view that the statutory language in section 10–4–609(3) exempting an insurer from the obligation to notify an insured of the availability of higher UM/UIM coverage "in any renewal or replacement policy" was intended to apply only to "the automatic continuation of the preceding policy, without material changes," and that the statutory exemption did not apply "when there are material changes in the policy," such as an increase in the liability limits of the policy or the addition of a new vehicle to the policy. Id. at 964. Because the record indicated that there were disputed issues of fact regarding Allstate's compliance with its statutory duties under section 10–4–609, the court of appeals reversed the summary judgment entered in favor of Allstate and remanded the case for further proceedings.[2]

2. Subsequent to the court of appeals' decision in this case, the General Assembly amended the Colorado Auto Accident Reparations Act by adding subsection (3) to section 10–4–712, 4A C.R.S. (1987), with an effective date of July 1, 1991, ch. 196, sec. 2, § 10–4–712, 1991 Colo.Sess.Laws. 1167–68. Section 10–4–712(3), 4A C.R.S. (1991 Supp.), states:

(a) The coverages described in section 10–4–706 [required coverages] are conditioned upon the insurer offering coverages pursuant to section 10–4–609(1).

(b) The insurer shall be deemed to have complied with the requirements of section 10–4–609(1) and the exclusion of the insured from uninsured motorist coverage shall be deemed valid if the named insured has rejected the uninsured motorist coverage in writing. Such exclusion shall be continuing until such time as the insured requests that the insurer provide uninsured motorist coverage. The insurer shall not have a duty to offer uninsured motorist coverage after receiving the insured's written request for exclusion even though:

(I) The vehicles insured under the policy have changed; or

(II) The policy is:

(A) Reinstated;
(B) Transferred;
(C) Substituted;
(D) Amended;
(E) Altered;
(F) Modified;
(G) Replaced; or
(H) Renewed.

(c) The insurer shall be deemed to have complied with section 10–4–609(1) and the insured's uninsured motorist coverage shall be deemed valid if the insurer has offered coverage at available levels and the insured has selected coverage of a certain value. The insurer shall not have a duty to offer changes in uninsured motorist coverage to the insured even though:

(I) The vehicles covered under the policy have changed; or

(II) The policy is:

(A) Reinstated;
(B) Transferred;
(C) Substituted;
(D) Amended;
(E) Altered;
(F) Modified;
(G) Replaced; or

We granted Allstate's petition for certiorari to consider the following two questions: whether the court of appeals erred in determining that the Parfreys could assert a violation of section 10–4–609(2) as the basis for a negligence claim against Allstate for breach of an insurer's statutory duty to offer an insured increased UM/UIM coverage; and whether the court of appeals properly concluded that the Parfreys' increase in their bodily injury liability coverage and the addition of another vehicle to their liability policy were material changes that triggered Allstate's statutory duty to offer the Parfreys the right to obtain higher UM/UIM coverage on those occasions.

## II.

■ We first address the threshold question of whether section 10–4–609(2) creates a private cause of action in tort based on an insurer's failure to notify an insured of the right to purchase UM/UIM coverage at a level higher than the minimum bodily injury liability coverage of $25,000 per person and $50,000 per accident. Unless section 10–4–609(2) furnishes an insured with a common law action in negligence against an insurer for breach of its statutory obligations, there is no reason to consider

whether the Parfreys' decision to increase their liability coverage and to add an additional vehicle to their policy triggered a duty on the part of Allstate to offer them higher UM/UIM coverage on either of those occasions.

Allstate argues that the legislative silence in section 10–4–609(2) on the matter of civil liability manifests a legislative intent to relegate the exclusive responsibility for redressing breaches of an insurer's statutory duty to the administrative process. We are unpersuaded by Allstate's argument.

We acknowledge that the legislative decision to enact a particular administrative remedy to redress a statutory violation is consistent with a legislative intent to preclude a private civil remedy for breach of the statutory duty. *See Board of County Comm'rs v. Moreland,* 764 P.2d 812, 819–20 (Colo.1988). Section 10–4–609(2), however, is totally silent on the matter of remedy, and no other statutory provision expressly addresses that question.[3] Because the statutory scheme does not expressly provide a method for enforcing a violation of section 10–4–609(2), we must determine whether a private civil remedy reasonably may be implied when an insurer violates its statutory duty under section 10–4–609(2).

(H) Renewed; except that if there is an increase in bodily injury liability limits and the limits of the uninsured motorist coverage would be less than such limits, the insurer shall offer new uninsured motorist coverage to the insured pursuant to section 10–4–609(2).

The 1991 addition of subsection (3) to section 10–4–712 was obviously intended to clarify an insurer's obligation under section 10–4–609. While our resolution of the instant case is based on the statutory scheme as it existed prior to the 1991 statute, we note in passing that subsection (3)(c)(II)(H) makes clear that an insurer must offer new uninsured motorist coverage to an insured "if there is an increase in bodily injury liability limits and the limits of the uninsured motorist coverage would be less than such limits." We also note that the 1991 statute does not address the degree of specificity required for a valid offer under subsection 10–4–609(2).

3. Section 10–4–418(1), 4A C.R.S. (1987), states that "[a]ny person aggrieved by any rate charged, rating plan, rating system, underwriting rule, policy form, certificate, or contract of

insurance or rider followed or adopted by an insurer" may request the insurer to review the manner in which "the rate, plan, system, rule, form, certificate, or contract or rider has been applied with respect to insurance afforded [the person]." If the commissioner, after examination of an insurer or upon the basis of other information, has good cause to believe that the insurer has not complied with its statutory duty, the commissioner may require the insurer to take corrective action. § 10–4–418(2)(a), 4A C.R.S. (1987). In addition, the insurance commissioner is authorized to suspend or revoke an insurer's license after a hearing at which the commissioner determines that the insurer has willfully violated its statutory duty or an order of the commissioner. § 10–4–418(4)(d) & (5)(b), 4A C.R.S. (1987). The enforcement provisions of section 10–4–418 are silent on the matter of enforcing the statutory requirements of section 10–4–609(2) regarding an insurer's obligation to inform an insured of the insured's right to obtain UM/UIM coverage in an amount higher than the minimum bodily injury liability limits of $25,000 per person and $50,000 per accident.

Our case law has indicated that the answer to whether a private tort remedy is available against a nongovernmental defendant for violating a statutory duty involves a consideration of three factors: whether the plaintiff is within the class of persons intended to be benefitted by the legislative enactment; whether the legislature intended to create, albeit implicitly, a private right of action; and whether an implied civil remedy would be consistent with the purposes of the legislative scheme. *See, e.g., Bittle v. Brunetti,* 750 P.2d 49, 55 (Colo.1988); *Largo Corp. v. Crespin,* 727 P.2d 1098, 1107–08 (Colo.1986); *see generally Cort v. Ash,* 422 U.S. 66, 77–78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975). When we analyze section 10–4–609 in light of those factors, we are led to conclude that a private tort remedy against an insurer is implicit in the statutory scheme.

There is no question that an insured is within the class of persons intended to be protected by section 10–4–609(2). The General Assembly in section 10–4–609(2) expressly imposed on insurers selling automobile liability insurance the duty to offer an insured the right to purchase UM/UIM coverage equal to "the insured's bodily injury liability limits or one hundred thousand dollars per person and three hundred thousand dollars per accident, whichever is less." The clear purpose of imposing this duty on the insurer is to protect the insured against the risk of inadequate compensation resulting from injuries and damages incurred in an automobile accident with an uninsured or underinsured motorist. We are also convinced that the General Assembly, in enacting section 10–4–609(2), impliedly intended to create a private civil remedy to redress an insurer's breach of its statutory duty. We say this because the availability of a civil tort remedy not only furnishes an effective incentive for an insurer to discharge its statutory duty but, more importantly, furthers the salutary goal of providing the driving public with a meaningful opportunity to protect themselves against the risk of inadequate compensation for injuries sustained in an accident with an uninsured or underinsured motorist. That goal would be substantially frustrated if an insured is without a private civil remedy to redress the injuries and damages caused by an insurer's failure to discharge its statutory responsibility. It follows from these observations that providing a private civil remedy to an insured is entirely consistent with the legislative purpose underlying UM/UIM coverage. We accordingly agree with the observation of the court of appeals that "[t]o require this coverage to be included in every policy unless expressly rejected by the insured, but then to foreclose the insured's right to relief for failure to provide this coverage, would, in all practicality, circumvent this statutorily imposed duty." *Parfrey,* 815 P.2d at 966.

### III.

We next consider that part of the court of appeals' decision which construed subsections 10–4–609(2) and (3) as imposing on Allstate the duty to offer the Parfreys higher UM/UIM coverage on those occasions when the Parfreys subsequently increased their bodily injury liability limits and added a new vehicle to the policy. In challenging the court of appeals' analysis, Allstate argues that once it offered the Parfreys the initial policy and the Parfreys purchased both bodily injury liability and UM/UIM coverage at the same level of $25,000 per person and $50,000 per accident, Allstate had no further obligation to offer the Parfreys higher UM/UIM coverage. Although we do not agree with the court of appeals' formulation of Allstate's statutory duty, we conclude that Allstate's argument is based on a faulty interpretation of section 10–4–609 and, for that reason, must be rejected.

### A.

■ In determining the nature and scope of an insurer's duty under the statutory scheme, we are guided by long-established principles of statutory construction. First and foremost is the principle that a statute should be construed in a manner which gives effect to legislative intent or purpose. *E.g., Woodsmall v. Regional Transp.*

*Dist.,* 800 P.2d 63, 67 (Colo.1990); *Allee v. Contractors, Inc.,* 783 P.2d 273, 276 (Colo. 1989); *Colorado Common Cause v. Meyer,* 758 P.2d 153, 160 (Colo.1988). Legislative intent finds primary expression in the statutory language employed by the General Assembly in carrying out its law-making function. *E.g., Griffin v. S.W. Devanney & Co., Inc.,* 775 P.2d 555, 559 (Colo.1989); *Engelbrecht v. Hartford Accident & Indem. Co.,* 680 P.2d 231, 233 (Colo.1984). We may properly presume that the General Assembly in enacting section 10–4–609 intended each part of a statute to be effective and also intended a just and reasonable result and one feasible of execution. §§ 2–4–201(1)(b), (c) & (d), 1B C.R.S. (1980).

■ Subsection (1) of section 10–4–609 prohibits an insurer from issuing an automobile liability policy unless UM/UIM coverage is included in the policy, except where the named insured rejects UM/UIM coverage in writing. Subsection (2) requires an insurer, "[p]rior to the time the policy is issued or renewed," to notify the insured of the right to obtain UM/UIM coverage at a level higher than the minimum liability limits of $25,000 and $50,000 per accident. Subsection (3) relieves the insurer of any duty to notify the insured of the availability of UM/UIM coverage "in any renewal or replacement policy" once the insured has either selected UM/UIM limits or has exercised the option not to purchase such coverage.

The term "renewal" is defined in section 10–4–601(3), 4A C.R.S. (1987), as the issuance and delivery of a policy "replacing at the end of the policy period a policy previously issued and delivered by the same insurer" or the issuance and delivery of a certificate or notice extending the term of the previous policy beyond its term. The General Assembly thus used the term "renewal" in subsection (3) of section 10–4–609 in the temporal sense of extending the term of a previously issued policy under the same insurance agreement. Although the statute does not contain a definition of the term "replacement" that also appears in subsection (3), the commonly understood meaning of "replace" is to supplant something with an equivalent or substitute. *See Black's Law Dictionary* 1299 (6th ed. 1990); *Webster's Third New International Dictionary* 1925 (1986). In the absence of any indication that the General Assembly intended the word replacement to have some special meaning peculiar to the insurance industry, we will construe it in its commonly used sense. *See Nationwide Mut. Ins. Co. v. Mast,* 153 A.2d 893, 895 (Del.Super.Ct.1959); *Brescoll v. Nationwide Mut. Ins. Co.,* 116 Ohio App. 537, 22 O.O.2d 423, 189 N.E.2d 173, 175 (1961). The term "replacement policy" in subsection 10–4–609(3) refers to a policy issued to replace a prior policy that has been lost or destroyed, or a new policy which, with the knowledge and agreement of the insured, incorporates provisions different from those in a prior policy.

In light of the purpose of section 10–4–609, which is to provide a member of the driving public with an opportunity to make an informed decision on an appropriate level of UM/UIM coverage, and in keeping with the presumption that the General Assembly intends the entire statute to be effective, as well as a just and reasonable result and a result feasible of execution, we construe subsection (2) of section 10–4–609 as creating a one-time duty upon an insurer to notify an insured of the nature and purpose of UM/UIM coverage and to offer the insured the opportunity to purchase such coverage in accordance with the insurer's rating plan and rules and in an amount equal to the insured's bodily injury liability limits but in no event in excess of $100,000 per person and $300,000 per accident, whichever is less. Our conclusion that this is a one-time duty finds support in the text of subsection (3), which relieves the insurer of the duty of notification, prior to the issuance of any renewal or replacement policy, once the insured has either selected UM/UIM limits or has exercised the option not to purchase such coverage. If the insurer fails to discharge its duty prior to the issuance of the policy, the duty continues and can be discharged only by an adequate notification and offer on some future occasion.

In holding, as we do, that an insurer has a one-time duty to inform an insured in a reasonable manner calculated to permit the insured to make an informed decision on whether to purchase UM/UIM coverage offered by the insurer at a level higher than the minimum statutory liability limits, we reject the conclusion of the court of appeals that an insurer must adhere to the mandatory offer requirements every time an insured makes a material change to an existing policy. There is nothing in the statutory text suggesting a legislative intent to incorporate the "material change" standard adopted by the court of appeals. In our view, if the General Assembly had intended to extend the duty of notification and offer to every occasion when an insured makes a "material change" in coverage—whether by modifying liability limits or by adding or substituting vehicles—we reasonably may assume that it would have expressed that rudimentary concept by appropriate language and would not have limited the insurer's duty, as it did in subsection (2), to "prior to the time the policy is issued or renewed." [4]

### B.

■■■ Our determination that an insurer has a one-time duty of notification and offer does not resolve the extent of specificity essential to the proper discharge of that duty, and it is that question which we now address. Subsection (2) requires an insurer to do more than merely make UM/UIM coverage available at a level higher than the minimum motor vehicle liability limits of $25,000 per person and $50,000 per accident. It bears mention here that because Colorado's statutory scheme requires minimum liability coverage of $25,000 per person and $50,000 per accident, a person purchasing minimum UM/UIM coverage would have no real protection against a

motorist whose liability coverage was at the same minimum level. In keeping with the legislative purpose of UM/UIM coverage to protect a person against the risk of inadequate compensation for injuries and damages caused by an uninsured or underinsured motorist, we hold that an insurer's duty of notification and offer must be performed in a manner reasonably calculated to permit the potential purchaser to make an informed decision on whether to purchase UM/UIM coverage higher than the minimum statutory liability limits of $25,000 per person and $50,000 per accident.

In determining whether an insurer has fulfilled its statutory duty, a court may appropriately consider such factors as the clarity with which the purpose of UM/UIM coverage was explained to the insured, whether the explanation was made orally or in writing, the specificity of the options made known to the insured, the price at which the different levels of UM/UIM coverage could be purchased, and any other circumstances bearing on the adequacy and clarity of the notification and offer. Our analysis of the specificity component of the insurer's duty of notification and offer finds support in the decisions of several other courts which have construed UM/UIM statutes similar to Colorado's statutory scheme. *See, e.g., Cloninger v. National General Ins. Co.,* 109 Ill.2d 419, 94 Ill.Dec. 549, 488 N.E.2d 548, 550 (1985) (sufficient information must be communicated to an insured to allow an insured to make an intelligent decision on UM/UIM coverage); *Libby v. Government Employees Ins. Co.,* 79 Md.App. 717, 558 A.2d 1236, 1240 (1989) (where insurer is required to notify insured of availability of UM/UIM coverage, insurer must do so in manner reasonably calculated to provide notice); *Hastings v. United Pacific Ins. Co.,* 318 N.W.2d 849, 851–52 (Minn.1982) (insurer must notify insured of availability of

---

**4.** That the General Assembly knew how to express the "material change" concept is obvious from the 1991 addition of subsection (3)(c)(II)(H) to section 10–4–712, 4A C.R.S. (1991 Supp.), which requires an insurer to offer

new UM/UIM coverage whenever "there is an increase in bodily injury liability limits and the limits of the uninsured motorist coverage would be less than such limits."

UM/UIM coverage in a commercially reasonable manner so as to allow insured to make intelligent decision on such coverage); [5] *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 291 S.C. 518, 354 S.E.2d 555, 556 (1987) (insurer must provide insured with adequate information, and in such manner as to allow insured to make an intelligent decision on whether to accept or reject UM/UIM coverage); *Bias v. Nationwide Mut. Ins. Co.*, 179 W.Va. 125, 365 S.E.2d 789, 791 (1987) (insurer must make offer in a manner designed to provide insured with adequate information to allow insured to make intelligent decision). In the final analysis, the determination of the insurer's discharge of its statutory duty to notify the insured of the availability of higher UM/UIM coverage and to offer such coverage to the insured must be resolved under the totality of circumstances.

## IV.

The final question is whether the court of appeals was correct in determining that the trial court erroneously entered summary judgment in favor of Allstate. We conclude that summary judgment was inappropriate under the circumstances present here.

"Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Churchey v. Adolph Coors Co.*, 759

P.2d 1336, 1339–40 (Colo.1988). Under our construction of section 10–4–609, Allstate would be entitled to judgment as a matter of law only if Allstate, prior to the issuance of the policy in March 1985 or on one of the subsequent occasions when coverage was modified or the policy was renewed, adequately notified the Parfreys that they had the right to obtain UM/UIM coverage higher than the minimum liability limits of $25,000 per person and $50,000 per accident and that they could do so by increasing their liability coverage and purchasing UM/UIM coverage in the same amount as their increased liability coverage up to $100,000 per person and $300,000 per accident. It is undisputed that when the Parfreys purchased their initial policy, Allstate provided them UM/UIM coverage in the amount of $25,000 per person and $50,000 per occurrence, which was the amount of the Parfreys' automobile liability coverage and hence was the only amount of UM/UIM coverage which Allstate was required to offer them at that time pursuant to section 10–4–609(2). What is disputed, however, is whether Allstate, prior to the issuance of the policy in March 1985, informed the Parfreys that they could increase their UM/UIM coverage by increasing their liability coverage and that they could purchase UM/UIM coverage at the same level as their liability coverage up to a maximum of $100,000 per person and $300,000 per accident. The evidence also is in dispute on whether Allstate discharged its duty of notification and offer either when the Parfreys later modified their lia-

---

5. In determining whether Allstate has made an "offer" sufficient to inform the Parfreys adequately of UM/UIM coverage, the court of appeals utilized a four-part test adopted by the Supreme Court of Minnesota in *Hastings v. United Pacific Ins. Co.*, 318 N.W.2d 849 (Minn.1982). *Parfrey*, 815 P.2d at 963. The four-part test requires that an effective offer of UM/UIM coverage in other than face-to-face negotiations must satisfy the following requirements: (1) the notification process must be commercially reasonable, whether made orally or in writing; (2) the limits of the optional coverage must be specified and not merely set forth in general terms; (3) the insurer must intelligently advise the insured regarding the nature of the optional coverage so as to enable the insured to evaluate

why the offer should be carefully considered; and (4) the insured must be advised that the optional coverages are available for a relatively modest increase in the premium. *Parfrey*, 815 P.2d at 963. While we find this four-part test helpful in determining whether a proper "offer" was made pursuant to section 10–4–609(2), we believe that the dispositive consideration is whether, under the totality of circumstances, the insurer's notification and offer to the insured adequately informed the insured that UM/UIM coverage was available in accordance with the insurer's rating plan and rules and in an amount equal to the insured's bodily injury liability limits but in no event in excess of $100,000 per person and $300,000 per accident, whichever is less.

bility coverage or when they received their six-month renewal notices on their policy. Robert Townsend, the Allstate agent, testified in his deposition that he discussed different levels of UM/UIM coverage when the Parfreys purchased their initial policy but, according to Mrs. Parfrey, Townsend did not inform them of the specific way in which that coverage operated. Although Townsend stated that it would have been his practice to offer the Parfreys higher UM/UIM coverage when the Parfreys later increased their liability limits and added the 1967 Ford to their policy, he had no recollection of any such discussion, nor did Mrs. Parfrey. Finally, the record does not resolve the factual question of whether the two renewal notices sent by Allstate to the Parfreys included information advising them of their right to obtain increased UM/UIM coverage at a level consistent with their increased liability coverage. In short, we believe the state of the record is such that genuine issues of fact exist concerning whether Allstate ever complied with its statutory duty to inform the Parfreys in a meaningful way of the nature and purpose of UM/UIM coverage and to offer them the right to purchase UM/UIM coverage higher than the minimum liability limits of $25,000 per person and $50,000 per accident.

We accordingly affirm the judgment of the court of appeals and remand the case to that court with directions to return the case to the trial court for further proceedings consistent with the views herein expressed.