507 P.3d 73
2021 COA 149
Margaret MULLEN, Plaintiff-Appellant,
v.
METROPOLITAN CASUALTY INSURANCE COMPANY, Defendant-Appellee.
Court of Appeals No. 20CA1357
Colorado Court of Appeals, Division III.
Announced December 16, 2021
Larson Larimer Schneider, P.C., Philip C. Zimmerman, Vance R. Larimer, Greenwood Village, Colorado, for Plaintiff-Appellant
Walberg Law, PLCC, Wendelyn Walberg, Katherine Smith Dedrick, Morrison, Colorado, for Defendant-Appellee
Jordan Herington & Rowley, Michael J. Rosenberg, Greenwood Village, Colorado; Law Office of Richard M. Crane, Richard M. Crane, Denver, Colorado, for Amicus Curiae Colorado Trial Lawyers Association
Opinion by JUDGE BROWN
¶ 1 In this declaratory judgment action, 507 P.3d 75 plaintiff, Margaret Mullen (Margaret[1] ), appeals the district court's entry of summary judgment in favor of defendant, Metropolitan Casualty Insurance Company (Metropolitan). To resolve this appeal, we must determine whether Metropolitan discharged its duty under section 10-4-609(2), C.R.S. 2021, to notify and offer the Mullens uninsured/underinsured motorist (UM/UIM) coverage. Under the standard set forth in Allstate Insurance Co. v. Parfrey , 830 P.2d 905 (Colo. 1992), the offer must have been made in a manner reasonably calculated to permit the Mullens to make an informed decision about whether and at what limits to purchase such coverage. Considering the totality of the circumstances — including that the UM/UIM selection form Metropolitan provided to the Mullens set forth an inaccurate statement of the law and was confusing — we conclude that Metropolitan did not discharge its duty. Thus, we reverse and remand to the district court to enter judgment in favor of Margaret.
I. Background
¶ 2 Margaret initiated the underlying litigation against Metropolitan to obtain a declaratory judgment that an election her late husband, Edward Mullen (Edward), made for UM/UIM coverage was legally ineffective. The parties agreed to file cross-motions for summary judgment. They also stipulated to a set of undisputed facts and to the authenticity of certain documentary exhibits. From the undisputed facts and authenticated documents, we set forth the following relevant factual background.
¶ 3 Metropolitan issued a new Colorado automobile insurance policy to "Edward J Mullen and Margaret Mullen" as the named insureds, effective May 15, 2010. On or about May 6, 2010, Metropolitan sent the Mullens a package of materials related to their new policy. Among other things, the package included the policy and a "Colorado Uninsured Motorists Coverage Selection Form" (UM/UIM Selection Form).
¶ 4 The policy carried liability limits of $100,000 per person and $300,000 per accident for bodily injury or death. As issued, the policy also carried UM/UIM coverage limits of $100,000 per person and $300,000 per accident.
¶ 5 On or about May 12, 2010, Edward completed and signed the UM/UIM Selection Form, selecting UM/UIM coverage in the amount of $25,000 per person and $50,000 per accident. Metropolitan processed the policy change effective July 15, 2010. Because the premium for UM/UIM coverage of $25,000/$50,000 was less than the premium the Mullens had paid for the original $100,000/$300,000 coverage, Metropolitan issued the Mullens a refund of the premium they overpaid.
¶ 6 Edward died on November 20, 2010. Margaret notified Metropolitan of his death and Metropolitan removed Edward as a named insured from the policy.
¶ 7 Later in 2011, Metropolitan provided Margaret with proposed 2011 policy renewal documents, which included a declarations page showing $25,000/$50,000 in UM/UIM coverage. The renewal documents encouraged her to review her coverage selections and to inform Metropolitan if the information was "different from what you asked for or currently need" or if her "insurance needs have changed." Each year between 2011 and 2018, the policy was renewed with liability limits of $100,000/$300,000 and UM/UIM coverage limits of $25,000/$50,000. Margaret never requested an increase in her UM/UIM coverage.
¶ 8 On October 17, 2018, Margaret was in a motor vehicle collision with an underinsured motorist and suffered serious injuries. On December 10, 2018, Metropolitan issued Margaret a $25,000 check as payment of the maximum UM/UIM benefits under the policy. Because Margaret's damages exceeded the $25,000 payment, she filed the underlying declaratory judgment action seeking a determination that the UM/UIM Selection Form Edward signed and returned to Metropolitan 507 P.3d 76 was ineffective to reduce her UM/UIM coverage.
¶ 9 In her motion for summary judgment, Margaret argued that section 10-4-609(2) required Metropolitan to offer the Mullens UM/UIM coverage before it issued the policy in 2010. According to Margaret, because Metropolitan made the UM/UIM coverage offer contemporaneously with its issuance of the policy, it failed to comply with the statute, rendering Edward's later execution of the UM/UIM Selection Form ineffective as to the 2010 policy and entitling her to UM/UIM coverage limits of $100,000/$300,000. Further, Margaret argued, because Edward died before the policy was renewed in 2011, he was not a named insured with authority to make a UM/UIM coverage selection relative to the 2011 renewal or any subsequent renewal. Finally, Margaret argued that Metropolitan failed to satisfy its duty under section 10-4-609, as articulated in Parfrey , 830 P.2d at 913-14, to offer the Mullens UM/UIM coverage in a manner reasonably calculated to permit them to make an informed decision as to the purchase of such coverage.
¶ 10 Metropolitan cross-moved for summary judgment, arguing that it satisfied its statutory obligations with a sufficient notice and offer to the Mullens to purchase UM/UIM coverage, that Edward's selection of the $25,000/$50,000 limits was effective as to the 2010 policy, and that it had no duty to reoffer UM/UIM coverage to Margaret in connection with any subsequent renewal of the policy.
¶ 11 The district court sided with Metropolitan. Following the rationale articulated by a division of this court in Airth v. Zurich American Insurance Co. , 2018 COA 9, 488 P.3d 308, the court concluded that Metropolitan had a one-time duty to offer UM/UIM coverage, which it satisfied by providing the UM/UIM Selection Form before the insured needed the UM/UIM coverage. It concluded that, as a named insured, Edward had authority to make the UM/UIM election when he made it and that the election was binding on Margaret after Edward's death. And it concluded that, under the totality of the circumstances, Metropolitan adequately notified the Mullens of the opportunity to purchase UM/UIM coverage. Accordingly, the district court denied Margaret's motion for summary judgment and granted Metropolitan's motion for summary judgment.
II. Analysis
¶ 12 Margaret contends that the district court erred by concluding that Metropolitan satisfied its statutory duties to (1) offer the Mullens UM/UIM coverage "before the policy is issued or renewed" and (2) notify the Mullens of the opportunity to purchase UM/UIM coverage in a manner reasonably calculated to permit them to make an informed decision.
¶ 13 Because we agree with Margaret's second contention, we need not resolve her first. We reverse the entry of summary judgment in favor of Metropolitan and remand to the district court to enter summary judgment in favor of Margaret.
A. Standard of Review
¶ 14 We review the entry of summary judgment de novo. Shelter Mut. Ins. Co. v. Mid-Century Ins. Co. , 246 P.3d 651, 657 (Colo. 2011). Summary judgment is appropriate where the pleadings and supporting documents clearly demonstrate that no issues of material fact exist and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c) ; Cotter Corp. v. Am. Empire Surplus Lines Ins. Co. , 90 P.3d 814, 819 (Colo. 2004). ¶ 15 To the extent our analysis requires us to interpret the applicable statutes, we do so de novo. Airth , ¶ 25. When interpreting a statute, we must ascertain and give effect to the intent of the General Assembly. Parfrey , 830 P.2d at 911 ; Airth , ¶ 26. We do so by first looking to the words of the statute and giving effect to their common meanings. Airth , ¶ 26. If those words are clear and unambiguous, we apply the statute as written. Id. ¶ 16 We also interpret insurance policies de novo, employing "well-settled principles of contractual interpretation." Allstate Ins. Co. v. Huizar , 52 P.3d 816, 819 (Colo. 2002) ; accord Shelter Mut. Ins. Co. , 246 P.3d at 666. We construe the plain language 507 P.3d 77 of the policy to fulfill the intent of the parties, and we resolve ambiguities in favor of the insured. Shelter Mut. Ins. Co. , 246 P.3d at 666.
B. Applicable Law
¶ 17 Section 10-4-609(1) states that no automobile liability policy shall be issued in Colorado unless it provides coverage for bodily injury or death "for the protection of persons ... legally entitled to recover damages from owners or operators of uninsured motor vehicles" at the limits set forth in section 42-7-103(2), C.R.S. 2021. Section 42-7-103(2) requires coverage for bodily injury or death of not less than $25,000 per person and $50,000 per accident. Insurers must provide UM/UIM coverage limits of at least $25,000/$50,000 unless the insured rejects such coverage in writing. § 10-4-609(1)(a).
¶ 18 Section 10-4-609 continues,
(2) Before the [automobile liability] policy is issued or renewed, the insurer shall offer the named insured the right to obtain uninsured motorist coverage in an amount equal to the insured's bodily injury liability limits, but in no event shall the insurer be required to offer limits higher than the insured's bodily injury liability limits.
(3) Notwithstanding the provisions of subsection (2) of this section, after selection of limits by the insured or the exercise of the option not to purchase the coverages described in this section, no insurer nor any affiliated insurer shall be required to notify any policyholder in any renewal or replacement policy, as to the availability of such coverage or optional limits. However, the insured may, subject to the limitations expressed in this section, make a written request for additional coverage or coverage more extensive than that provided on a prior policy.
(4) Uninsured motorist coverage shall include coverage for damage for bodily injury or death that an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle. An underinsured motor vehicle is a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident.
¶ 19 Under section 10-4-623(3)(c), C.R.S. 2021, an insurer "shall be deemed to have complied with section 10-4-609(1) and the insured's uninsured motorist coverage shall be deemed valid if the insurer has offered coverage at available levels and the insured has selected coverage of a certain value." The insurer does not have an obligation to offer changes in uninsured motorist coverage when the insured renews a policy unless "there is an increase in bodily injury liability limits and the limits of the uninsured motorist coverage would be less than such limits," under which circumstances the insurer "shall offer new uninsured motorist coverage to the insured pursuant to section 10-4-609(2)." § 10-4-623(3)(c)(II). ¶ 20 The legislative purpose of section 10-4-609 "is to provide a member of the driving public with an opportunity to make an informed decision on an appropriate level of UM/UIM coverage." Parfrey , 830 P.2d at 912. In keeping with that purpose — and with the presumption that the General Assembly intended the statute to be effective, have a just and reasonable result, and be feasible of execution, see id. — the Colorado Supreme Court has interpreted section 10-4-609(2) as creating a "one-time duty upon an insurer to notify an insured of the nature and purpose of UM/UIM coverage and to offer the insured the opportunity to purchase such coverage." Parfrey , 830 P.2d at 912. The supreme court's conclusion that the insurer's obligation to offer UM/UIM coverage consistent with the statute is a "one-time duty" is supported by section 10-4-609(3), which "relieves the insurer of the duty of notification, prior to the issuance of any renewal or replacement policy, once the insured has either selected UM/UIM limits or has exercised the option not to purchase such coverage." Parfrey , 830 P.2d at 912. "If the insurer fails to discharge its duty prior to the issuance of the policy, the duty continues and can be discharged only by an adequate notification and offer on some future occasion." Id.[2] 507 P.3d 78 ¶ 21 When an insurer fails to offer an insured optional coverage it is statutorily required to offer, "additional coverage in conformity with the required offer is incorporated into the agreement by operation of law." Jewett v. Am. Standard Ins. Co. of Wis. , 178 P.3d 1235, 1238 (Colo. App. 2007) (quoting Thompson v. Budget Rent-A-Car Sys., Inc. , 940 P.2d 987, 990 (Colo. App. 1996) ) (analyzing the question in the context of statutorily required additional personal injury protection coverage); accord Brennan v. Farmers All. Mut. Ins. Co. , 961 P.2d 550, 554 (Colo. App. 1998). Because an insured is entitled to the coverage absent a statutorily required offer, the operative question is not whether coverage was initially offered before the initial purchase of a policy, but rather whether the insurer provided the insured with the opportunity to purchase coverage before the insured needed it. Airth , ¶ 22 ; see also Jewett , 178 P.3d at 1238. ¶ 22 But the supreme court has made clear that section 10-4-609(2) requires that an insurer do more than simply make statutorily required UM/UIM coverage available: "[A]n insurer's duty of notification and offer must be performed in a manner reasonably calculated to permit the potential purchaser to make an informed decision on whether to purchase UM/UIM coverage higher than the minimum statutory liability limits of $25,000 per person and $50,000 per accident." Parfrey , 830 P.2d at 913.
In determining whether an insurer has fulfilled its statutory duty, a court may appropriately consider such factors as the clarity with which the purpose of UM/UIM coverage was explained to the insured, whether the explanation was made orally or in writing, the specificity of the options made known to the insured, the price at which the different levels of UM/UIM coverage could be purchased, and any other circumstances bearing on the adequacy and clarity of the notification and offer. Id. ¶ 23 A court should look to the objective reasonableness of the insurer's offer rather than the potential purchaser's subjective understanding of the offer. See Airth , ¶ 21 ; Reid v. Geico Gen. Ins. Co. , 499 F.3d 1163, 1169 (10th Cir. 2007) (" Parfrey ... suggests that we look to the objective reasonableness of [the insurer's] offer, not the potential purchaser's subjective understanding."). And no one Parfrey factor is dispositive. Airth , ¶ 18. Ultimately, whether the insurer discharged its statutory duty "to notify the insured of the availability of higher UM/UIM coverage and to offer such coverage to the insured must be resolved under the totality of the circumstances." Parfrey , 830 P.2d at 914 ; see also id. at 914 n.5 ("[W]e believe that the dispositive consideration is whether, under the totality of the circumstances, the insurer's notification and offer to the insured adequately informed the insured that UM/UIM coverage was available" in accordance with the statute.).
¶ 24 Against this backdrop, we evaluate the reasonableness of the offer Metropolitan made to the Mullens to purchase UM/UIM coverage.
C. Metropolitan's Offer Did Not Fulfill Its Statutory Duty
¶ 25 Margaret contends that the district court erred by concluding that Metropolitan satisfied its statutory duty to offer the Mullens UM/UIM coverage in a manner reasonably calculated to enable them to make an informed decision regarding the purchase of UM/UIM coverage. We agree.
¶ 26 On or about May 6, 2010, Metropolitan provided the Mullens with approximately seventy pages of written materials related to their new insurance policy. As relevant here, the package included these documents:
• the policy;
• the UM/UIM Selection Form;
• a "Colorado Private Passenger Automobile Insurance Summary Disclosure Form" (Summary Disclosure); and
• a policy declarations page.
507 P.3d 79 Because determining whether an insurer has discharged its statutory duty to reasonably notify and offer UM/UIM coverage must be resolved under the totality of the circumstances, see Parfrey , 830 P.2d at 914, we consider these materials together.
¶ 27 For two reasons we conclude that Metropolitan did not discharge its statutory duty. First, the UM/UIM Selection Form sets forth an inaccurate statement of the law that incorrectly suggests that UM/UIM coverage would not be available if an underinsured motorist's liability limits were the same as or greater than the insured's UM/UIM limits. Second, the information in the UM/UIM Selection Form regarding available levels of coverage and related premiums is confusing.
1. Inaccurate Statement of the Law ¶ 28 The UM/UIM Selection Form, page 6 of the packet of materials, explains first that UM/UIM coverage is an important part of the policy and that "this form is used to select the limits of [UM/UIM coverage] that are best suited to your needs." It further explains that UM/UIM coverage provides protection for damages caused by an "Underinsured Motorist," which the form defines as "an at-fault driver whose liability coverage limits are less than your [UM/UIM] Coverage limits. " (Emphasis added.) This was an incorrect statement of law at the time the policy was issued.
¶ 29 Before the 2008 amendments to section 10-4-609, an underinsured motor vehicle was defined, as relevant here, as
a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident, but the limits of liability for bodily injury or death under such insurance or bonds are ... [l]ess than the limits for uninsured motorist coverage under the insured's policy. § 10-4-609(4)(a), C.R.S. 2007 (version effective until Jan. 1, 2008); see also Jordan v. Safeco Ins. Co. of Am., Inc. , 2013 COA 47, ¶ 25, 348 P.3d 443. Senate Bill 07-256 redefined underinsured motor vehicle as "a land motor vehicle, the ownership, maintenance, or use of which is insured or bonded for bodily injury or death at the time of the accident," eliminating the references to the underinsured motorist's limits of liability and the insured's UM/UIM limits. Ch. 413, sec. 2, § 10-4-609(4), 2007 Colo. Sess. Laws 1922.
¶ 30 This change is significant because, before the 2008 amendments, the statute fixed the "maximum liability of the insurer under the uninsured motorist coverage" at the lesser of "[t]he difference between the limit of uninsured motorist coverage and the amount paid to the insured" by the underinsured motorist or "[t]he amount of damages sustained, but not recovered." § 10-4-609(5), C.R.S. 2007; see also Jordan , ¶ 24. The 2008 amendment eliminated those liability limitations and instead clarified that UM/UIM coverage "shall be in addition to any legal liability coverage and shall cover the difference, if any, between the amount of the limits of any legal liability coverage and the amount of the damages sustained ... up to the maximum amount of the coverage obtained pursuant to this section." § 10-4-609(1)(c), C.R.S. 2021; see Ch. 413, sec. 1, § 10-4-609(1)(c), 2007 Colo. Sess. Laws 1921.
¶ 31 The 2008 amendments clarify that UM/UIM coverage covers the difference between a tortfeasor's insurance liability limit and the amount of damages sustained by the insured, up to the amount of the UM/UIM coverage purchased. Under the pre-2008 version of the statute, if the insured recovered $50,000 as the liability limit from the tortfeasor but had only $50,000 in UM/UIM coverage, the insured's maximum recovery would be $50,000, even if they sustained $100,000 in damages. See Jordan , ¶ 37 (first citing Vaccaro v. Am. Fam. Ins. Grp. , 2012 COA 9M, ¶ 59, 275 P.3d 750 ; then citing Carlisle v. Farmers Ins. Exch. , 946 P.2d 555, 558 (Colo. App. 1997) ); see also Parfrey , 830 P.2d at 913 (explaining, relative to the pre-2008 statute that, "because Colorado's statutory scheme requires minimum liability coverage of $25,000 per person and $50,000 per accident, a person purchasing minimum UM/UIM coverage would have no real protection against a motorist whose liability coverage was at the same minimum level"). Under the current version of the statute, however, assuming the same policy limits, the insured may recover 507 P.3d 80 up to $100,000. Jordan , ¶ 37. Thus, as a division of this court explained in Jordan , the amendments effectively changed Colorado's UM/UIM statutory scheme "from a ‘reduction’ approach — where [UM/UIM] coverage was reduced by any payment received or judgment against the tortfeasor — to an ‘excess’ approach — where [UM/UIM] coverage is payable for damages exceeding the tortfeasor's liability policy limit, subject only to the [UM/UIM] coverage limit in the insured's policy." Id. at ¶ 30.
¶ 32 Here, the district court recognized that the language of the UM/UIM Selection Form was problematic, but it concluded that while the language was not "a complete statutory definition of the scope of [UM/UIM] coverage under § 10-4-609(1)(c) following the 2008 amendment, the language ... is not totally incorrect ; it is simply not complete. " On this point, we disagree.
¶ 33 The language of the UM/UIM Selection Form invokes the old statutory scheme by setting forth the outdated definition of underinsured motorist. The form thus incorrectly suggests to the insured that the UM/UIM coverage under the policy does not cover damages caused by a tortfeasor whose liability limits match or exceed the UM/UIM coverage selected by the insured, regardless of the amount of damages the insured sustained. That is not an accurate statement of the law as it exists now or as it existed in 2010, when Metropolitan issued the policy to the Mullens. Even if the tortfeasor's liability limits exceed the UM/UIM coverage under the policy, the insured would be entitled to UM/UIM coverage for any damages that exceed the tortfeasor's liability limits, up to the limits of UM/UIM coverage under the policy.
¶ 34 Metropolitan contends that, to the extent the information in the UM/UIM Selection Form was "incomplete," it should have encouraged the Mullens to purchase more UM/UIM coverage, not less, as Edward elected. This is so, it argues, because under the pre-2008 law, the more UM/UIM coverage the insured had, the less likely it would be that the tortfeasor would have the same or more liability coverage. And if the tortfeasor had the same or more liability coverage, the insured would not recover any UM/UIM benefits. See § 10-4-609(5), C.R.S. 2007; Parfrey , 830 P.2d at 913 ; Jordan , ¶ 37.
¶ 35 Regardless of whether the inaccurate statement of the law should have encouraged the potential purchaser to buy more or less coverage, we fail to see how such an inaccuracy would enable that potential purchaser to make an informed decision about whether and at what limit to purchase UM/UIM coverage. Cf. Briggs v. Am. Nat'l Prop. & Cas. Co. , 209 P.3d 1181, 1187-88 (Colo. App. 2009) (holding that "if an insurance company has offered its customers the option to purchase UM/UIM coverage on all their vehicles with sufficient accurate information , it has satisfied its obligation under" section 10-4-609(2), but concluding that an insurer's continued use of a UM/UIM-limiting exclusion invalidated by Colorado case law did not satisfy that statutory obligation because it "could have been materially misleading" such that the insured "might not have had the opportunity to make an informed decision about whether and how to purchase [UM/UIM] coverage"). ¶ 36 The district court concluded, however, that "[t]he complete and accurate definition of ‘Underinsured Motorist,’ and of [UM/UIM] coverage in general" is set forth in the Summary Disclosure provided contemporaneously with the UM/UIM Selection Form. It reasoned that the Mullens received complete and accurate information about the scope of UM/UIM coverage "when the information in all documents received is considered," and that the incomplete definition in the UM/UIM Selection Form "does not compromise the complete and accurate information" in the Summary Disclosure.[3] ¶ 37 Relative to UM/UIM coverage, the Summary Disclosure, found at page 19 of the 507 P.3d 81 packet of materials Metropolitan provided to the Mullens, explains as follows:
You must be offered [UM/UIM] coverage, and it will be included in your policy unless you reject it in writing.
....
[UIM] coverage pays for bodily injury that you are entitled to collect from an underinsured owner or driver who is at fault for the accident and when the damages exceed the driver's liability coverage.
Generally, an underinsured automobile is an automobile whose liability coverage is not enough to pay the full amount you are legally entitled to recover as damages.
¶ 38 Although the Summary Disclosure gives a definition of "underinsured automobile" that differs from the definition of "underinsured motor vehicle" under section 10-4-609(4), we acknowledge that it generally sets forth an accurate description of how UM/UIM coverage operates under the current version of section 10-4-609(1)(c) — that is, UM/UIM coverage is available when the insured's damages exceed the tortfeasor's liability coverage. But the first page of the Summary Disclosure explains that it is "only a general description and not a statement of contract or a policy of any kind" and clarifies that "[a]ll coverage is subject to the terms, conditions, and exclusions of your policy...." Then, in bold capital letters, it warns, "THIS SUMMARY DISCLOSURE FORM SHALL NOT BE CONSTRUED TO REPLACE ANY PROVISION OF THE POLICY ITSELF."
¶ 39 The policy, in turn, at page 47 of the packet of materials, defines "underinsured motor vehicle" as "a motor vehicle which has a bodily injury liability bond or insurance policy in effect at the time of the accident, in at least the minimum amount required ... but less than the limits of this coverage provided by this policy as stated in the Declarations." (Emphasis added.) The policy's definition of underinsured motor vehicle shares the same flaws as the UM/UIM Selection Form's definition of underinsured motorist. Both rely on a statutory definition that the General Assembly eliminated two years before Metropolitan issued the original policy to the Mullens. And both result in the misimpression that the availability of UM/UIM benefits depends on a comparison of the tortfeasor's liability limits and the insured's UM/UIM limits.
¶ 40 It would have been reasonable for the Mullens to place the most emphasis on the UM/UIM Selection Form, as it was the standalone form purporting to require the selection or waiver of such coverage. Cf. Airth , ¶ 19 (concluding that "reasonable people would not disagree" that the insurer had complied with its statutory notification and offer obligations under section 10-4-609(2) when the standalone coverage selection document "explained, in writing, the purpose of UM/UIM coverage in clear and understandable terms" in the first sentence of the document). But even if the Mullens had looked to the policy, as the Summary Disclosure directed them to do, they would not have been given a clear, adequate, or accurate description of the purpose or operation of UM/UIM coverage under then-existing law.
2. Confusing Coverage Options ¶ 41 The UM/UIM Selection Form advises that Metropolitan must give the insured UM/UIM coverage "for at least the minimum limits required by law, unless you reject the coverage in writing." It does not explain what the "minimum limits required by law" are. The UM/UIM Selection Form continues, "For a relatively modest increase in premium, you may purchase [UM/UIM] Coverage in greater amounts." But, it clarifies in bold font, "your [UM/UIM] limits cannot be greater than your Bodily Injury Liability Coverage Limits."
¶ 42 The UM/UIM Selection Form then sets forth four levels of coverage, and an option to waive coverage entirely. It does not provide the specific premiums associated with each level of coverage.
507 P.3d 82
 Uninsured Motorists Coverage (UM)

 [] $ ________ $25.000 per person/$50,000 per accident

 [] $ ________ $50,000 per person/$100,000 per accident

 [] $ ________ $100,000 per person/$300,000 per accident

 [] $ ________ $250,000 per person/$500,000 per accident

 [] I reject Uninsured Motorists Coverage completely but I understand that I may add this
 coverage at any future date.
¶ 43 Margaret contends that the absence of premium information for each level of UM/UIM coverage, combined with the fact that the UM/UIM Selection Form appears to offer a level of coverage unavailable to the Mullens (the $250,000/$500,000 level exceeds the policy's bodily injury liability limits of $100,000/$300,000), demonstrates that the offer was confusing and unreasonable. She also contends that the language in the UM/UIM Selection Form indicating that the insured's UM/UIM benefits cannot be greater than the insured's bodily injury liability limits is not correct because section 10-4-609(2) states only that an insurer is not required to offer UM/UIM coverage with limits higher than the insured's liability coverage, not that an insurer cannot offer higher limits.
¶ 44 We reject Margaret's contention that the language "your [UM/UIM] limits cannot be greater than your Bodily Injury Liability Coverage Limits" is misleading. True, section 10-4-609(2) does not prohibit an insurer from offering higher UM/UIM limits, but we agree with the district court that this language in the UM/UIM Selection Form is fairly read as reflecting Metropolitan's position as an insurance company not to offer UM/UIM limits greater than those required by law.
¶ 45 We also conclude that Metropolitan's failure to provide specific premium amounts does not, by itself, render Metropolitan's offer insufficient under the statute. See Airth , ¶ 18 (reasoning that failure to provide insured with stated premium "does not in and of itself" render the insured's UM/UIM offer insufficient under the statute); cf. Johnson v. State Farm Mut. Auto. Ins. Co. , 158 F. App'x 119, 122 (10th Cir. 2005) ("Although the lack of a discussion of the price of enhanced [personal injury protection] insurance is an important factor under the Parfrey analysis, State Farm's failure to inform [the insured] about the specific cost does not in itself render the offer commercially unreasonable."). It would be easy for an insured interested in purchasing additional coverage to ask for the premium price. See Johnson , 158 F. App'x at 122. Indeed, the UM/UIM Selection Form encourages the insured to contact a customer service representative with any questions. And the policy declarations, found at page 33 of the packet of materials Metropolitan provided to the Mullens, reflected an annual premium of $120 for the $100,000/$300,000 limits included in the original policy, which at least informed the Mullens of the cost of that level of coverage.[4] ¶ 46 But we agree with Margaret that the absence of premium information is not the only problem with the part of the UM/UIM Selection Form setting forth coverage levels. When the Mullens received the UM/UIM Selection Form, their policy already included UM/UIM coverage limits of $100,000/$300,000. Thus, there would have been no increase in premium — let alone any "relatively modest increase in premium" — if the Mullens selected the $25,000/$50,000, $50,000/$100,000, or $100,000/$300,000 coverage levels. In fact, selection of the $25,000/$50,000 and $50,000/$100,000 levels would have resulted in 507 P.3d 83 (and did result in) a decrease in premium from what the Mullens were already paying, and selection of the $100,000/$300,000 level would have resulted in no change in premium. Because the UM/UIM Selection Form was delivered to the Mullens simultaneously with a policy that already included the maximum amount of UM/UIM coverage they could purchase, the information Metropolitan provided about increased premiums was inaccurate.[5] Given that the policy included bodily injury liability limits of $100,000/$300,000, the Mullens could not have selected the $250,000/$500,000 coverage level, even though it appeared to be an available option on the UM/UIM Selection Form.
¶ 47 So, the UM/UIM Selection Form failed to inform the Mullens of the minimum UM/UIM limits Metropolitan must legally provide or what limits their policy already included, erroneously informed them that selection of coverage greater than the unidentified minimums would result in an increase in premium, failed to set forth the premiums associated with each level of coverage, and offered them coverage limits they were not allowed to select. Under these circumstances, we conclude that the UM/UIM Selection Form is confusing.
¶ 48 Considering the totality of the circumstances, see Parfrey , 830 P.2d at 914, we conclude that Metropolitan did not discharge its statutory obligation to notify and offer the Mullens UM/UIM coverage in a manner reasonably calculated to permit them to make an informed decision about whether and at what limits to purchase such coverage. Accordingly, we also conclude that the district court erred by granting Metropolitan's motion for summary judgment and by denying Margaret's motion for summary judgment.
III. Conclusion
¶ 49 We reverse the district court's entry of summary judgment in favor of Metropolitan and remand the case with directions to enter summary judgment in favor of Margaret.
JUDGE FURMAN and JUDGE LIPINSKY concur.
--------
Notes:
[1] Because Margaret Mullen shares a last name with her late husband, Edward Mullen, we adopt the practice used by her appellate counsel and refer to Margaret and Edward by their first names. We mean no disrespect by this informality.
[2] The version of the statute the Parfrey court applied provided, in relevant part, that "[p]rior to the time the policy is issued or renewed, the insurer shall offer the named insured the right to obtain higher limits of uninsured motorist coverage...." § 10-4-609(2), C.R.S. 1987 (emphasis added).
[3] Metropolitan contends that we must defer to the district court's "factual determinations" about the information Metropolitan provided the Mullens unless they are "clearly erroneous." But when the controlling facts are undisputed, as they are here, the legal effect of those facts constitutes a question of law that we review de novo. See Hicks v. Londre , 125 P.3d 452, 455 (Colo. 2005) ; Camp Bird Colo., Inc. v. Bd. of Cnty. Comm'rs , 215 P.3d 1277, 1281 (Colo. App. 2009).
[4] In rejecting Margaret's argument that Metropolitan's offer provided insufficient premium information, the district court noted that, at least as of August 19, 2010, the Mullens were aware that ten months of coverage at the $25,000/$50,000 level cost $58 less than coverage at the $100,000/$300,000 level for the same period, because they received a refund in that amount when Edward elected the lower coverage. But this information came long after Metropolitan's offer and Edward's selection of UM/UIM coverage, so we do not see how it is a relevant consideration to the reasonableness of the offer when it was made.
[5] Had Metropolitan offered UM/UIM coverage through the UM/UIM Selection Form before the policy was issued , as it is required to do by section 10-4-609(2), C.R.S. 2021, the offer may not have been so confusing. But we must consider the totality of the circumstances when determining whether Metropolitan satisfied its statutory obligation, see Allstate Ins. Co. v. Parfrey , 830 P.2d 905, 914 (Colo. 1992), and the timing of the offer relative to the issuance of the policy is one such factor.
--------