209 P.3d 1119 (2008)
Douglas WAGNER, individually and on behalf of all others similarly situated, Plaintiff-Appellant,
v.
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, f/k/a Travelers Indemnity Company of Illinois, Defendant-Appellee, and
Colorado Trial Lawyers Association, Amicus Curiae.
No. 07CA2112.
Colorado Court of Appeals, Div. IV.
November 13, 2008.
Rehearing Denied December 31, 2008.
Certiorari Denied June 22, 2009.
*1120 Hill & Robbins, P.C., Robert F. Hill, John H. Evans, Jr., Nathan P. Flynn, Denver, Colorado; Evans & McFarland, LLC, J. *1121 Luke McFarland, M. Gabriel McFarland, Golden, Colorado; McFarland Law Offices, Zachary C. McFarland, Thomas D. McFarland, Golden, Colorado, for Plaintiff-Appellant.
Montgomery, Kolodny, Amatuzio & Dusbabek, L.L.P., C. Michael Montgomery, Erik R. Neusch, Denver, Colorado, for Defendant-Appellee.
Roberts Levin Rosenberg, PC, Bradley A. Levin, Denver, Colorado, for Amicus Curiae Colorado Trial Lawyers Association.
Opinion by Judge ROY.
Plaintiff, Douglas Wagner (Wagner), individually and on behalf of all others similarly situated, appeals the trial court's summary judgment in favor of Travelers Property Casualty Company of America (Travelers) on all of his claims. We vacate the judgment and remand the case for further proceedings consistent with this opinion.

I. Summary
The issue presented for review, as framed by Wagner, is as follows:
Whether Travelers is exempt from the duty to disclose to its customers truthful information about the scope of [UM/UIM] insurance coverage and to deal fairly with them, solely because [Travelers] requires its customers to purchase UM/UIM insurance on all of their insured vehicles or on none of those vehicles.
Wagner contends that the trial court erred in granting summary judgment on his claim that Travelers had an obligation to advise him upon the renewal of his multi-vehicle policy of the implications of DeHerrera v. Sentry Insurance Co., 30 P.3d 167 (Colo. 2001) and Jaimes v. State Farm Mutual Automobile Insurance Co., 53 P.3d 743 (Colo. App.2002). DeHerrera held that uninsured and underinsured (UM/UIM) coverages insure and, therefore, follow the insured and not the vehicle; Jaimes held that the "owned but not insured" (OBNI) exclusion was void. Following DeHerrera and Jaimes, Travelers continued to charge, or to indicate that it charged, premiums for UM/UIM coverage by the vehicle, and its policy continued to include an OBNI exclusion. However, according to Wagner, under DeHerrera insuring one vehicle provided him and his resident family with UM/UIM coverage in any vehicle, owned or nonowned, insured or not insured.
The trial court granted summary judgment to Travelers on its argument that, because it issued only multi-vehicle polices and did not offer the customers the option to insure less than all of their vehicles with UM/UIM coverage, no additional disclosure was required. The court addressed only a duty to disclose under section 10-4-609, C.R.S.2008.
We conclude that section 10-4-609 does not require Travelers to advise Wagner of the implications of either DeHerrera or Jaimes. However, we further conclude that there is a genuine question of material fact as to whether a reasonable consumer could believe that Travelers sold UM/UIM coverage on a vehicle basis rather than a policy basis, as it contends, and thus, purchasing UM/UIM coverage on all vehicles was necessary to protect the named insured(s) and residential family members. Finally, we conclude that any further proceedings must address all of Wagner's claims separately, and summary judgment on those claims predicated on sources of duty other than section 10-4-609 is not appropriate on the present record.

II. The Facts
Wagner purchased motor vehicle insurance including liability and UM/UIM coverage on two vehicles in one multi-vehicle policy from Travelers. Only the UM/UIM coverage is at issue here.
The policy listed Wagner as the named insured and also insured two classes of unnamed insureds. The policy charged a separate and identified premium for each coverage (liability, comprehensive, collision, uninsured motorist, and personal injury protection). The pertinent part of the declaration page appeared as follows:
4. Coverages, Limits of Liability and Premiums Insurance is provided only where a premium is shown for the coverage.

*1122
 1 2
 95 PLYM 97 FORD
 GRAND EXPLORER
 VOYA A
 A - Bodily Injury
 $100,000 each person
 $300,000 each accident $66 $103
 B - Property Damage
 $50,000 each accident 36 57
 D1 - Uninsured Motorists
 $100,000 each person
 $300,000 each accident
 See Endorsement
 AOS015 30 31
 E - Collision Actual
 Cash Value less $200
 deductible 72 47
 F - Comprehensive
 (Other than Collision)
 Actual Cash Value less
 $100 deductible 67 144
 I - Towing and Labor
 Costs $25 per
 disablement 2 2
 Q - Personal Injury Protection
 $50,000 per person
 per accident See
 Endorsement A05026 40 89

(Emphasis added.)
The policy also contained an OBNI exclusion applicable to the UM/UIM coverage which provided:
A. We do not provide Uninsured Motorists Coverage for "bodily injury" sustained by any person:
1. While "occupying," or when struck by, any motor vehicle owned by you or any "family member" which is not insured for this coverage under this policy. This includes a trailer of any type used with that vehicle.
(Emphasis added.)
The policy insured two classes of insuredsClass one included the named insured and any other person related to the named insured by blood, marriage, or adoption, including a ward or foster child, who was a resident of the named insured's household, or temporarily living elsewhere; Class two included any other person occupying a covered vehicle with the consent of the named insured or a pedestrian if the accident involved the covered auto. If a customer purchased UM/UIM coverage on one vehicle, only Class one was insured. However, upon insuring the second vehicle both classes were insured.
This litigation commenced in 2003 as a class action with twenty-seven plaintiffs against twenty-five insurance companies. The case was, however, subsequently broken up into twenty-seven very similar individual class actions in 2006. The class has not yet been certified pursuant to C.R.C.P. 23.
Wagner asserted claims for (1) fraudulent concealment; (2) negligent misrepresentation by omission; (3) unjust enrichment; (4) bad faith; (5) violation of the Colorado Consumer Protection Act; and (6) declaratory judgment. The relief sought was compensatory damages together with punitive damages, treble damages, and attorney fees permitted by law, depending on the claim.
The central allegation to each claim, with minor variations appropriate to each claim, is that Travelers had a duty to, but did not, advise Wagner on the implications of DeHerrera and Jaimes when renewing the UM/UIM coverage. In addition, Travelers continued to include the OBNI exclusion in its policies although it was invalid after Jaimes.

III. The Legal Environment
UM/UIM coverage in Colorado is controlled by section 10-4-609, C.R.S.2008. While the statute has been amended during the pertinent period, it has substantively remained the same for our limited purpose. It currently provides:
§ 10-4-609. Insurance protection against uninsured motoristsapplicability.
(1)(a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle licensed for highway use in this state unless coverage is provided ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting *1123 therefrom; except that the named insured may reject such coverage in writing.
. . . .
(2) Before the policy is issued or renewed, the insurer shall offer the named insured the right to obtain uninsured motorist coverage in an amount equal to the insured's bodily injury liability limits, but in no event shall the insurer be required to offer limits higher than the insured's bodily injury liability limits.
(3) Notwithstanding the provisions of subsection (2) of this section, after selection of limits by the insured or the exercise of the option not to purchase the coverages described in this section, no insurer nor any affiliated insurer shall be required to notify any policyholder in any renewal or replacement policy, as to the availability of such coverage or optional limits....
This litigation was commenced after, and in large part because of, our supreme court's decision in DeHerrera and, to a lesser extent, the decision of a division of this court in Jaimes.
In DeHerrera, the plaintiff's son, while riding an uninsured off-road motorcycle, was injured after being struck by an at-fault driver of an underinsured truck. The plaintiff owned a multi-vehicle insurance policy insuring two automobiles with, as pertinent here, UM/UIM coverage. The named insureds on the policies were the plaintiff and her husband; the son was an insured as a member of the family residing in the household. Nevertheless, the insurance company denied liability because, as relevant here, the UM/UIM coverage was limited to injuries sustained while an insured was "occupying a car" covered by the policy.
Our supreme court, based primarily on the purpose of section 10-4-609(1), held "the language and purpose of the UM/UIM statute require an insurer to provide UM/UIM benefits to a person insured under the policy when injured in an accident caused by an uninsured or underinsured motorist without regard to the vehicle occupied by the insured at the time of injury." DeHerrera, 30 P.3d at 169.
While the validity of the OBNI exclusion was not explicitly before the supreme court in DeHerrera, it was before a division of this court in Jaimes. There, a husband and wife owned two automobiles insured under two separate policies with the same insurer but with different UM/UIM policy limits. Each policy contained the OBNI exclusion. The husband was injured in an accident with an underinsured at-fault driver while driving the automobile with the lower UM/UIM policy limit. The husband settled with the underinsured driver for liability policy limits that equaled the lower UM/UIM limit for the policy covering the automobile which he was driving. The husband sought UM/UIM benefits based on the higher policy limit for the other automobile from the insurer. The insurer denied the higher benefits, concluding that the at-fault driver was not underinsured based on the UM/UIM policy limit for the automobile in which the husband was injured. A division of this court, on remand from the supreme court, stated:
The supreme court's analysis [in DeHerrera] relied heavily on the legislative intent behind § 10-4-609(1), but its conclusions are also supported by the unambiguous language of the statute itself. Section 10-4-609(1)(a) plainly states that UM/UIM coverage is "for the protection of persons insured [under the policy] who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom".... The operative event for coverage under the statute is an injury to an insured arising from an accident involving an at-fault, uninsured or underinsured motor vehicle. Under the statute, the status of the insured at the time of the accident, whether the occupant of the insured motor vehicle as operator or passenger, the occupant of a nonowned motor vehicle as operator or passenger, a pedestrian, or the operator of an owned but not insured vehicle, is not germane to the insurer's obligation to provide UM/UIM benefits.
Therefore, in our view, the "owned but not insured" exclusion is void as against the public policy of Colorado.
*1124 Jaimes, 53 P.3d at 746-47 (emphasis added and omitted). Jaimes also held that DeHerrera applied retroactively. Id. at 747.
Of somewhat less importance to the issues presented here is Allstate Insurance Co. v. Parfrey, 830 P.2d 905 (Colo.1992). In Parfrey, the insureds, husband and wife, initially purchased a multi-vehicle policy with minimum liability and UM/UIM policy limits and over the years increased liability policy limits but were not offered the opportunity to, and did not, increase UM/UIM limits. The husband was seriously injured in an accident involving an at-fault vehicle with minimum liability coverage; thus, there was no underinsured coverage. The pertinent issue there was whether insurers were obligated by statute to continually advise insureds concerning their right to increase UM/UIM policy limits as liability limits were increased.
Our supreme court held that the offer required by section 10-4-609(2) was a one-time obligation. The court stated:

[W]e construe subsection (2) of section 10-4-609 as creating a one-time duty upon an insurer to notify an insured of the nature and purpose of UM/UIM coverage and to offer the insured the opportunity to purchase such coverage in accordance with the insurer's rating plan and rules and in an amount equal to the insured's bodily injury liability limits.... Our conclusion that this is a one-time duty finds support in the text of subsection (3)....
Parfrey, 830 P.2d at 912 (emphasis added).

IV. Trial Court Rulings
On September 1, 2005, prior to separating the cases, the trial court issued an order applying Parfrey to the facts of this case. After concluding that DeHerrera did not announce a new rule of law, the trial court stated:
In this case, Defendants maintain that they have fulfilled the duty imposed by Parfrey; because it is a one time duty, they maintain, no additional duty of notification and offer is required. The Court finds, however, that if the one time discharge of the duty upon which Defendants rely is a notification and offer based on the owned but not insured exclusion, that notification and offer does not discharge the duty because the information provided in the notification and offer was erroneous. Applying the Parfrey factors to determine whether an insurer has fulfilled its duty, the Court finds that an offer based on erroneous information does not provide clarity to the insured regarding the purpose of UM/UIM coverage, it does not afford the insured sufficient knowledge of the options, and it does not properly inform the insured about the price at which the different levels of UM/UIM coverage could be purchased.
In other words, notice and offer based on an exclusion which has been held to be invalid could not inform an insured in a reasonable manner calculated to permit the insured to make an informed decision about whether to purchase UM/UIM coverage. While the information may have seemed reasonable and accurate under the circumstances pre-DeHerrera, it was, ultimately, erroneous. Erroneous information cannot satisfy the statutory requirement to provide information that would permit an insured to make an informed decision.
In granting summary judgment to Travelers, the trial court concluded that, because of its business practice of offering only multi-vehicle insurance policies without permitting an insured to choose to insure some but not other vehicles for UM/UIM coverage, DeHerrera was not implicated and no disclosure or advice concerning the impact of DeHerrera was required under section 10-4-609 or Parfrey. The trial court stated:
In this context, inclusion of the owned but not insured exclusion did not create a false material inducement to purchase UM/UIM coverage for additional vehicles; there was no choice available to purchase or reject UM/UIM coverage on a per vehicle basis. Plaintiffs allege factual issues as to whether Travelers wrote, as opposed to rated, UM/UIM coverage on a per vehicle basis; however, under these business practices, it is a distinction that makes no difference. It is undisputed that Travelers['] insureds could not and did not purchase UM/UIM coverage on a per vehicle basis. Disclosure of the invalidity of the owned but not insured exclusion affects decision-making *1125 regarding whether to purchase UM/UIM coverage on additional vehicles. Here, there was no decision-making concerning whether to purchase UM/UIM coverage on certain additional vehicles because there was no option to purchase UM/UIM coverage on some but not all vehicles.
The Court finds Travelers had no duty to disclose to insureds that, as a result of DeHerrera, they received coverage greater than the bargained for coverage. Disclosure is necessary when it is a component of decision-making. In this case, there was no decision to be made by the insured post-DeHerrera. By operation of law, the DeHerrera decision, Travelers' insureds simply received additional coverage for UM/UIM losses in an owned but not insured vehicle. Finally, the Court notes that Travellers [sic] did not deny any UM/UIM claims based on the owned but not uninsured exclusion post-DeHerrera

In our view, whether Travelers enforced the OBNI in its claims processing post-DeHerrera, which the trial court appears to have relied upon in part, is not germane to the issues presented here. Further, and again in our view, neither DeHerrera, Jaimes, nor the statute explicitly or implicitly prohibit Travelers from issuing multi-vehicle insurance policies. Indeed, section 10-4-609(1)(c), which was added in 2007, states in part, "A single policy or endorsement for uninsured or underinsured motor vehicle coverage issued for a single premium covering multiple vehicles may be limited to applying once per accident." (Emphasis added.)
The trial court granted summary judgment, based on Travelers' argument that neither the statute nor the interpretive cases prohibit its business practice of selling UM/UIM coverage in multi-vehicle policies and priced on a vehicle basis, stating:
Colo.Rev.Stat. § 10-4-609(1) does not, by its plain language, require UM/UIM coverage to be offered on a per vehicle basis. The Court also finds that DeHerrera does not require that result; the Court finds the DeHerrera language relied upon by Plaintiffs to be a description of the facts in that case, and not a mandate for all insurance companies. The Court finds that Parfrey recognized that different insurance companies may have different business practices and required UM/UIM offers to be "in accordance with the insurer's rating plan and rules." [Id.,] 830 P.2d at 912. The offer of UM/UIM coverage is mandated, but the manner in which it is offered and sold was not mandated.
The language of DeHerrera relied upon by Wagner and characterized by the trial court as a comment on the facts of that case stated:
We note that the argument can be made that requiring UM/UIM insurance irrespective of the vehicle occupied by an insured at the time of injury may encourage unjust results in particular circumstances. For instance, a family owning more than one vehicle may purchase insurance for only one vehicle, under the rule of this case, and yet recover UM/UIM benefits when struck by an uninsured motorist while occupying any of its owned but uninsured vehicles.

DeHerrera, 30 P.3d at 176 (emphasis added).
We conclude that the language, while perhaps dicta, explained how the holding would apply to a fact scenario which some might conclude could result in an "injustice" and was not a comment on the facts of that case. In addition, the "coverage greater than the bargained for coverage" alluded to in the trial court's summary judgment order apparently referred to the addition of the Class two insureds upon insuring the second vehicle.

V. Analysis and Holding
We review an order granting summary judgment de novo. Brodeur v. Am. Home Assurance Co., 169 P.3d 139, 146 (Colo.2007). Summary judgment is appropriate only when the pleadings, affidavits, depositions, or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Id.; see C.R.C.P. 56(c).
We also review the interpretation of insurance contracts de novo. Allstate Ins. Co. v. Huizar, 52 P.3d 816, 819 (Colo.2002). Terms contrary to statutory provisions or in violation of public policy are void. Aetna *1126 Casualty & Surety Co. v. McMichael, 906 P.2d 92, 100 (Colo.1995). Otherwise, we give contract terms their plain and ordinary meanings and construe ambiguous terms in favor of the insured. Id.; Hoang v. Assurance Co. of America, 149 P.3d 798, 802 (Colo. 2007). A term is ambiguous when it is reasonably susceptible of more than one meaning. Carlisle v. Farmers Ins. Exch., 946 P.2d 555, 556 (Colo.App.1997).
Exclusionary language that conflicts with an insured's objectively reasonable expectations is not enforceable. State Farm Mut. Auto. Ins. Co. v. Nissen, 851 P.2d 165, 167-68 (Colo.1993). A common sense analysis of insurance contracts is particularly appropriate because automobile insurance policies are sold to consumers who are not expected to be highly sophisticated in the art of reading them. Id. at 167.
To effectuate the intent of the General Assembly, our supreme court has construed section 10-4-609 to require an insurer to offer UM/UIM coverage to a class of persons at least as extensive as the class covered under the liability provisions of its policy. McMichael, 906 P.2d at 97. Also, the insurer may not limit UM/UIM coverage by vehicle type. DeHerrera, 30 P.3d at 175-76; Bernal v. Lumbermens Mutual Casualty Co., 97 P.3d 197, 202-03 (Colo.App.2003). Insurance contracts that fail to meet these requirements are construed to include, for the purposes of UM/UIM coverage, all persons who would be insured under the contract's liability provisions. McMichael, 906 P.2d at 101.
DeHerrera clearly shifted the coverage analysis from the vehicle insured to the person insured; that is, the UM/UIM coverage follows the insured, not the vehicle. Therefore, insuring one vehicle with UM/UIM coverage includes, at a minimum, the named insured and residential family members injured in that and any other vehicle. Thus, carrying UM/UIM coverages on multiple vehicles may well be unnecessary in the multi-vehicle policy.
In our view, the inclusion of the OBNI exclusion in the insurance policy post-DeHerrera and Jaimes may well be affirmatively misleading. DeHerrera involved, as here, a multi-vehicle policy and extended UM/UIM coverage to a residential insured operating an uninsured vehicle and injured in a collision involving an at-fault underinsured motorist.

A. Issue of Material Fact
Summary judgment is appropriate if there "is no genuine issue as to any material fact." C.R.C.P. 56(c).
As a business practice, Travelers issues automobile policies using a multi-vehicle policy form. The concept is to insure all of the drivers and vehicles in a household under one policy. However, it appears to be undisputed that an individual owning one vehicle can insure that vehicle with Travelers on its multi-vehicle form. It is conceded by Travelers that, absent the OBNI exclusion, a customer owning multiple vehicles could insure one with Travelers on its multi-vehicle form with UM/UIM coverage and insure the others with another company without UM/UIM coverage, or vice versa, and the UM/UIM coverage would insure the named insured and his or her resident relatives in any vehicle, owned or nonowned, insured or not insured.
Travelers insists that it sold UM/UIM coverage on a household or policy, not vehicle, basis. In support of its motion for summary judgment, it submitted the affidavit of an expert witness who stated:
In simple terms, insurance has two fundamental characteristics, (1) the transfer of risk from an individual and (2) the redistribution of risk or the sharing of losses, on an equitable basis, by all members of the group paying UM/UIM premium.... Using historical experience and cost projections for the coming year, an actuary will predict the aggregate expected total UM/UIM loss and expense for the coming year. The actuary will then determine what unit of allocation to divide into the aggregate total and that amount will be the rate of premium assessed for each unit. In my experience, the most commonly used unit is a car-year or half-year, depending on whether the insurer issues policies for an annual term or a six-month term. The car *1127 is considered a reasonable unit of allocation because of its correlation to the UM/UIM risk exposure.
However, it is important to keep in mind that the unit used to assess the premium for collection purposes is simply a mechanism for allocating the premium. An insurer's actuary could just as easily decide to use the number of licensed drivers in a household, the number of cars, or a combination of these and other factors, to allocate the premium. Regardless of the unit of allocation used, the aggregate premium collected will be the same.
. . . .
After reviewing the materials, the apparent source of the confusion upon which this entire case seems to arise is the manner in which [insurer] allocates its premium and displays that allocation on its declaration page. On the declaration page of [insured], for example, there is a premium by vehicle column with separate columns for autos numbered 1, and 2. Opposite the UM/UIM coverage there is a premium of $30.00 and $31.00 displayed for each of the auto columns for a total UM/UIM premium of $61.00 per six months.... [Insured] seems to believe that the separate premiums displayed correspond to separate UM/UIM coverage for each car, but that is not the case. The display of the UM/UIM premium as $30.00 or $31.00 per car is simply a reflection of how the premium for the coverage is allocated. It is not an indication of there being "separate" coverage on each car. All of the cars are covered under the UM/UIM policy language whether the premium is allocated by policy, number of drivers or number of cars. The premium could also be shown as $61 for the policy which covers both cars.
Further, Travelers filed a rate proposal with the Colorado Insurance Commission, effective April 17, 2005, in which it stated, in part:
In response to the 2003 DeHerrera case, we propose the implementation of a policy level Uninsured Motorist coverage that is based on a combination of the number of vehicles and the number of drivers on the policy.... We are changing uninsured motorist base rates from vehicle level to policy level.
Travelers insists it was selling UM/UIM coverages on a policy or household basis. Based on (1) the charge for UM/UIM coverages on a vehicle basis; (2) the inclusion of an OBNI exclusion in the policy; and (3) the underwriting of the risk UM/UIM basis, we conclude there is a genuine issue of material fact as to how a reasonable customer would perceive Travelers was selling the UM/UIM coverageby the vehicle or by policy/householdduring the period of time in question. If the fact finder were to conclude that the coverage was sold by the vehicle, then Wagner and others similarly situated could have been misled into believing that they had to pay for UM/UIM coverage on all owned vehicles to have the coverage in any of them, and others, post-DeHerrera.
In our view, this issue must be determined by the trier of fact, here the jury.

B. Application of Section 10-4-609
The trial court concluded that (1) section 10-4-609 requires that Travelers advise a customer of the implications of DeHerrera so as not to make the information provided misleading; and (2) Travelers is exempted from that requirement because it sells only multi-vehicle policies without an option to purchase UM/UIM coverage on fewer than all of the vehicles insured under the policy.
In our view, section 10-4-609(1) requires that any automobile insurance policy include UM/UIM coverage, and section 10-4-609(2) requires Travelers to "offer the named insured the right to obtain higher limits of uninsured motorist coverage in accordance with its rating plan and rules." (Emphasis added.) Here, it is undisputed that Wagner purchased UM/UIM coverage. Wagner is not asserting that he was not inadequately informed with respect to the availability of the coverage under section 10-4-609(1) or that he was not advised concerning his options to increase policy limits as required by section 10-4-609(2).
Instead, Wagner is alleging that Travelers had an obligation to inform him that he need insure only one vehicle with UM/UIM coverage *1128 to obtain such coverage for the named insured and resident relatives in all vehicles, owned or not owned, insured or not insured. We decline to extend the statute to encompass more than it unambiguously requires.
The trial court concluded not only that section 10-4-609 imposed a duty to inform customers of the implications of DeHerrera, but by implication further concluded that the statute was the sole source of that duty. We disagree with both propositions and now address the latter.

C. Wagner's Claims
In entering summary judgment the trial court focused on the claim that neither the statute, DeHerrera, Jaimes, nor Parfrey prohibits multi-vehicle insurance policies. The trial court, while apparently concluding that the summary judgment order disposed of all claims, never addressed the claims pleaded by Wagner, which are broader in scope than section 10-4-609.
As guidance to the trial court on remand, we briefly discuss some, but not all, of those claims because they have been alleged; they are not premised on section 10-4-609; they may have arguable merit; and they are not amenable to summary judgment on the present record. We are not, however, expressing an opinion on their ultimate merit.
Wagner argues here, as he did before the trial court in response to Travelers' motion for summary judgment, that sections 10-1-101 and XX-X-XXXX, C.R.S.2008, can form a basis for a claim. In addition, Wagner alleged claims of fraudulent concealment, negligent misrepresentation by omission, unjust enrichment, bad faith, violation of the Colorado Consumer Protection Act, and declaratory judgment in his complaint.
Section 10-1-101 is a legislative declaration of public policy which states:
The general assembly finds and declares that the purpose of this title is to promote the public welfare by regulating insurance to the end that insurance rates shall not be excessive, inadequate, or unfairly discriminatory, to give consumers thereof the greatest choice of policies at the most reasonable cost possible, to permit and encourage open competition between insurers on a sound financial basis, and to avoid regulation of insurance rates except under circumstances specifically authorized under the provisions of this title. Such policy requires that all persons having to do with insurance services to the public be at all times actuated by good faith in everything pertaining thereto, abstain from deceptive or misleading practices, and keep, observe, and practice the principles of law and equity in all matters pertaining to such business.

(Emphasis added.)
Legislative declarations assist the courts in construing a statute, but they are not operative statutes. Vail Assocs., Inc. v. Eagle County Bd. of County Commr's, 983 P.2d 49, 56 (Colo.App.1998), rev'd, 19 P.3d 1263 (Colo.2001). However, in Ballow v. PHICO Insurance Co., 875 P.2d 1354, 1362-63 (Colo.1993), our supreme court held that section 10-1-101 established a standard of care applicable to the insurance industry actionable as a private claim.
There, the insurer, PHICO, which was in the process of withdrawing from the market, modified its claims made policies on renewal by requiring the physician insured to purchase extended reporting period, or tail, coverage. Tail coverage is typically purchased when the physician is leaving the practice and wants to insure against claims made after the policy terminates. A large group of physicians sued PHICO alleging, and the trial court awarded compensatory and punitive damages on, breach of contract, fraud, negligent misrepresentation, and bad faith claims. The claims were premised on statements made by PHICO concerning its financial condition and reassuring the physicians of its intent to remain in the market. Our supreme court affirmed and, with respect to section 10-1-101, stated:
It is the nature of the relationship created by the insurance contract, rather than the activity involved, which determines if the duty of good faith and fair dealing exists. And, as we stated in [Travelers Insurance Co. v. Savio, 706 P.2d 1258 (Colo.1985)], this relationship "permeates all of the dealings of the parties." Id. at 1268 (emphasis *1129 added). Moreover, it is the policy of this state, announced in section 10-1-101... that all persons providing insurance services to the public must "be at all times actuated by good faith in everything pertaining thereto." This duty is not limited, as PHICO argues, merely to the claims or cancellation contexts. Instead, the duty, as formulated by the General Assembly, is a broad and wide-ranging one, extending to "everything pertaining" to the provision of insurance services to the public.

PHICO, 875 P.2d at 1363 (emphasis added).
In addition, section 10-3-1104, which deals with the regulation of insurance companies, provides, in pertinent part:
(1) The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:
(a) Misrepresentations and false advertising of insurance policies: Making, issuing, circulating, or causing to be made, issued, or circulated, any estimate, circular, statement, sales presentation, omission, or comparison which:
(I) Misrepresents the benefits, advantages, conditions, or terms of any insurance policy....
Section 10-3-1104(1)(a)(I) is a regulatory statute and cannot be the basis for a private cause of action. Schnacker v. State Farm Mutual Automobile Insurance Co., 843 P.2d 102, 104 (Colo.App.1992). However, in Peiffer v. State Farm Mutual Automobile Insurance Co., 940 P.2d 967, 971 (Colo.App.1996), aff'd and remanded, 955 P.2d 1008 (Colo.1998), which involved a bad faith claim arising from the denial of a claim, a division of this court stated:
Here, plaintiff's witness, an expert in insurance claims practice with 22 years of insurance industry experience, opined that State Farm had violated several provisions of the UCSPA [Unfair Claims Settlement Practices Act, § 10-3-1101, et. seq.] when it denied plaintiff's claim. The witness testified to the facts of State Farm's conduct in light of the provisions of the UCSPA and applicable insurance industry standards.
The testimony was relevant insofar as it concerned plaintiff's contention that State Farm's conduct constituted bad faith based on the purported violations of the UCSPA. See §§ 10-3-1113(4) and 10-3-1104(1)(h). It was helpful insofar as it served to explain complex issues of insurance company claims management practices. See CRE 702; see also Zuchel v. City & County of Denver, 997 F.2d 730 (10th Cir.1993). Finally, since the testimony related to a subject that the jury was expressly permitted to consider, and the witness did not testify to matters beyond this subject, any prejudice associated with this testimony did not substantially outweigh its probative value. See CRE 403.
Thus, while we agree with State Farm that an expert witness should not dictate the law that the jury should apply, an expert witness is permitted, in the trial court's discretion, to refer to the facts of the case in legal terms. Here, because the expert's testimony discussed the facts, his mention of legal standards and terms was admissible.
Under these circumstances, we perceive no abuse of discretion in allowing the testimony in this case.
In order to establish a claim for relief under the Colorado Consumer Protection Act (CCPA), Wagner must show: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P.3d 142, 146-47 (Colo.2003). The sale of insurance is the sale of goods and services subject to the CCPA. Showpiece Homes Corp. v. Assurance Co. of America, 38 P.3d 47, 58 (Colo.2001). Our discussion of statutory claims should not be taken as foreclosing Wagner's common law claims.
*1130 The summary judgment is vacated and the case is remanded to the trial court for further proceedings consistent with this opinion.
Judge WEBB and Judge HAWTHORNE concur.