1
 25 CO 8 League of Women Voters of Greeley, Weld County, Inc.; Latino Coalition of Weld County; Barbara Whinery; and Stacy Suniga, Petitioners v. The Board of County Commissioners of the County of Weld, Respondent No. 24SC394
Supreme Court of Colorado, En Banc
February 24, 2025
 
           C.A.R.
 50 Certiorari to the Colorado Court of Appeals Court of
 Appeals Case No. 24CA774 Weld County District Court Case No.
 23CV30834 Honorable Todd L. Taylor, Judge
 
 
          
 Attorneys for Petitioners: Womble Bond Dickinson (US) LLP
 Kenneth F. Rossman, IV Kendra N. Beckwith Elizabeth Michaels
 Joseph Hykan Denver, Colorado
 
 
          
 Attorneys for Respondent: Hall &Evans, L.L.C. Matthew J.
 Hegarty Alexandria L. Bell Denver, Colorado
 
 2
 
          
 Attorneys for Amici Curiae American Civil Liberties Union
 Foundation and American Civil Liberties Union of Colorado:
 Timothy R. Macdonald Sara R. Neel Lindsey M. Floyd Denver,
 Colorado
 
 
          
 Attorneys for Amicus Curiae Colorado Attorney General: Philip
 J. Weiser, Attorney General Natalie Hanlon Leh, Chief Deputy
 Attorney General Jennifer L. Sullivan, Deputy Attorney
 General Kurtis T. Morrison, Deputy Attorney General Alex J.
 Acerra, Assistant Attorney General Joshua J. Luna, Assistant
 Attorney General Cata A. Cuneo, Assistant Attorney General
 Denver, Colorado
 
 
          
 JUSTICE HOOD delivered the Opinion of the Court, in which
 JUSTICE BOATRIGHT, JUSTICE GABRIEL, JUSTICE HART, JUSTICE
 SAMOUR, and JUSTICE BERKENKOTTER joined.
 
 
           CHIEF
 JUSTICE MARQUEZ concurred in the judgment.
 
 3
 
          
 OPINION
 
 
           HOOD,
 JUSTICE
 
 
          ¶1
 In 2023, the Board of County Commissioners of the County of
 Weld (the "Board") approved a new map for electing
 county commissioners. In approving the map, the Board chose
 not to comply with sections 30-10-306.1 to -306.4, C.R.S.
 (2024) (the "redistricting statutes"), asserting
 that its compliance with statewide mandates was unnecessary
 because Weld is a home rule county.
 
 
          ¶2
 Weld County residents Stacy Suniga and Barbara Whinery; the
 League of Women Voters of Greeley, Weld County, Inc.; and the
 Latino Coalition of Weld County (collectively, the
 "Voters") sued the Board. They sought a declaratory
 judgment that the Board must comply with the redistricting
 statutes and an injunction to prohibit the Board from using
 the new map. The district court agreed with the Voters and
 granted summary judgment in their favor.
 
 
          ¶3
 Today, we consider whether home rule counties, like Weld,
 must comply with Colorado's redistricting statutes. As
 threshold matters, we hold that the redistricting statutes
 provide a private right of action and that the Voters have
 standing to sue the Board. We further hold that the
 redistricting statutes apply to home rule counties, and
 therefore, the Board must immediately comply with them.
 
 
          I.
 Facts and Procedural History
 
 
          ¶4
 Weld has been a home rule county since 1976. The Board
 includes two at-large commissioners, elected by all voters in
 Weld County, and three district-
 
 4
 
 specific commissioners, elected by voters in each of the
 three districts in Weld County.
 
 
          ¶5
 At a March 1, 2023 hearing, the Board considered a single map
 that it had drawn. Several Weld County voters, including
 petitioners Suniga and Whinery, were present. These voters
 objected to the proposed map and asked the Board to comply
 with the redistricting statutes. Weld County's attorney
 responded that home rule counties, such as Weld, don't
 need to comply with them. Although the parties dispute the
 law, the fact that the Board didn't comply with the
 statutes when adopting the map is undisputed.
 
 
          ¶6
 The Voters sued the Board. The district court granted the
 Voters' motion for summary judgment and enjoined the
 Board from using the newly adopted map. In so doing, the
 court ruled that (1) the Voters have standing to challenge
 the Board's approval of the redistricting plan; (2) the
 redistricting statutes govern county commissioner
 redistricting in Weld County; and (3) because the Board
 violated the redistricting statutes, the Voters are entitled
 to declaratory and injunctive relief to compel the Board to
 comply with the redistricting statutes in approving a new
 map.
 
 5
 
          ¶7
 The Board appealed the district court's order to the
 court of appeals. The Voters then petitioned this court for
 certiorari review before judgment pursuant to C.A.R. 50. We
 granted the Voters' petition.[1]
 
 
          II.
 C.A.R. 50 Jurisdiction
 
 
          ¶8
 We granted the Voters' petition for certiorari review
 under C.A.R. 50 because this case "involves a matter of
 substance that is of sufficient public importance to justify
 deviation from normal appellate processes and requires
 immediate determination in this court." Colo. State
 Bd. of Educ. v. Adams Cnty. Sch. Dist. 14, 2023 CO 52,
 ¶ 17, 537 P.3d 1, 7; see also C.A.R. 50(a)(3).
 Our decision will
 
 6
 
 not only clarify the scope of Colorado's redistricting
 statutes but also allow Weld County to adjust before its next
 commissioner election in 2026.
 
 
          III.
 Analysis
 
 
          ¶9
 We begin with an overview of the redistricting statutes. We
 then address the following issues in turn: whether the
 redistricting statutes provide a private right of action,
 whether the Voters have standing, and whether home rule
 counties must follow the redistricting statutes'
 procedures. Finally, we examine the proper remedy for failing
 to comply with the statutes.
 
 
          ¶10
 In conducting this analysis, we review all issues of
 constitutional and statutory interpretation de novo.
 Kulmann v. Salazar, 2022 CO 58, ¶ 15, 521 P.3d
 649, 653. We also review standing issues de novo. Colo.
 State Bd. of Educ., ¶ 19, 537 P.3d at 7. When
 construing a statute, "we first look to the statutory
 language itself, giving words and phrases their commonly
 accepted and understood meaning." Town of Erie v.
 Eason, 18 P.3d 1271, 1276 (Colo. 2001). Our primary task
 is to effectuate the legislative purpose, id. at
 1275, and "our responsibility is to give full meaning to
 the legislative intent," Conte v. Meyer, 882
 P.2d 962, 965 (Colo. 1994).
 
 
          A.
 The Redistricting Statutes
 
 
          ¶11
 In 2021, the Colorado General Assembly enacted House Bill
 21-1047 ("H.B. 21-1047") to curb gerrymandering in
 county commissioner redistricting in
 
 7
 
 a manner consistent with requirements for federal and state
 legislative redistricting. Ch. 70, secs. 1-3, §§
 30-10-306 to -306.4, 2021 Colo. Sess. Laws 277, 277-87.
 
 
          ¶12
 In counties with a population exceeding seventy thousand,
 like Weld, the board of county commissioners must divide the
 county into districts according to a final redistricting
 plan. § 30-10-306(2), C.R.S. (2024). The board must
 designate a redistricting commission to establish those
 districts, and the statute encourages the board to make that
 commission independent. § 30-10-306.1(1), C.R.S. (2024).
 
 
          ¶13
 In addition, the commission must hold at least three public
 hearings, § 30-10-306.4(1)(f), C.R.S. (2024), soliciting
 feedback on at least three different plans before adopting a
 final plan, § 30-10-306.4(1)(d). The commission is
 precluded from voting on a final plan "until at least
 seventy-two hours after it has been proposed to the
 commission in a public meeting," § 30-10-306.2(2),
 C.R.S. (2024), and it must "provide meaningful and
 substantial opportunities for county residents to present
 testimony, either in person or electronically, at
 hearings," § 30-10-306.2(3)(b).
 
 
          ¶14
 In drafting the plan, the redistricting statutes require the
 commission to:
 
 
 • "[m]ake a good-faith effort to achieve
 mathematical population equality between districts,"
 § 30-10-306.3(1)(a), C.R.S. (2024);
 
 8
 
 • "preserve whole communities of interest and whole
 political subdivisions" as is "reasonably
 possible," including making districts "as compact
 as . . . reasonably possible," § 30-10-306.3(2);
 and
 
 
 • "maximize the number of politically competitive
 elections in the county," § 30-10-306.3(3)(a).
 
 
          ¶15
 Lastly, section 30-10-306.4 lays out the deadlines for the
 preparation, amendment, and approval of the plans. The board
 of county commissioners must establish these deadlines to
 ensure that it adopts "a plan for the redrawing of
 county commissioner districts no later than September 30 of
 the redistricting year." § 30-10-306.4(1).
 
 
          B.
 Private Right of Action
 
 
          ¶16
 The Board asserts that because the redistricting statutes
 don't expressly create a private right of action, none
 exists. We disagree.
 
 
          ¶17
 True, we require a "clear expression" of
 legislative intent to establish a private right of action.
 City of Arvada ex rel. Arvada Police Dep't v. Denver
 Health &Hosp. Auth., 2017 CO 97, ¶ 22, 403 P.3d
 609, 614 (quoting State v. Moldovan, 842 P.2d 220,
 227 (Colo. 1992)). But if a statute doesn't explicitly
 provide a private right of action, we may consider (1)
 "whether the plaintiff is within the class of persons
 intended to be benefitted by the legislative enactment";
 (2) "whether the legislature intended to create, albeit
 implicitly, a private right of action"; and
 
 9
 
 (3) "whether an implied civil remedy would be consistent
 with the purposes of the legislative scheme."
 Gerrity Oil &Gas Corp. v. Magness, 946 P.2d 913,
 923 (Colo. 1997) (quoting Allstate Ins. Co. v.
 Parfrey, 830 P.2d 905, 911 (Colo. 1992)).
 
 
          ¶18
 Because the redistricting statutes are silent regarding a
 private right of action, we employ this three-factor test
 here. The test for whether there's an implied private
 right of action is the same for both private and government
 defendants. City of Arvada, ¶ 24, 403 P.3d at
 615.
 
 
          ¶19
 First, the Voters are within the class of persons
 intended to benefit from the redistricting statutes. The
 General Assembly's stated purpose for enacting H.B.
 21-1047 was to empower "voters in every Colorado county
 . . . to elect commissioners who will reflect the communities
 within the county and who will be responsive and accountable
 to them." Ch. 70, sec. 1(1)(i), 2021 Colo. Sess. Laws
 277, 278. Petitioners in this case are two individual
 registered Weld County voters and two nonprofit organizations
 whose members are also Weld County voters. These are the
 constituents the redistricting statutes are intended to
 benefit.
 
 
          ¶20
 Second, we conclude that the General Assembly
 intended to give registered voters a private right of action
 to ensure that counties comply with the redistricting
 statutes. After all, the General Assembly told us that it
 wanted "to ensure that counties that elect some or all
 of their commissioners by the voters of individual districts
 are held to the same high standards that Amendments Y and Z
 require of
 
 10
 
 redistricting for congressional districts, state house of
 representative districts, and state senate districts,"
 including through "robust public participation."
 Ch. 70, sec. 1(2), 2021 Colo. Sess. Laws 277, 278. This goal
 would be thwarted if the very constituents this law is
 designed to protect couldn't seek its enforcement.
 See, e.g., Parfrey, 830 P.2d at 911
 (explaining that the goal of the uninsured/underinsured
 motorist coverage statute would be "substantially
 frustrated . . . without a private civil remedy to redress
 the injuries and damages caused by an insurer's failure
 to discharge its statutory responsibility").
 
 
          ¶21
 Third, an implied civil remedy is consistent with
 the purposes of the redistricting statutes' legislative
 scheme. As we have already explained, the procedural
 requirements in the redistricting statutes promote
 transparency and fairness. Without the remedy provided by a
 private right of action, those elaborate requirements could
 become a dead letter. That outcome is impossible to square
 with the purposes of the legislative scheme.
 
 
          ¶22
 Thus, because the Voters are among the class of persons
 protected by the redistricting statutes, pursuant to which
 the General Assembly implicitly created a private right of
 action and a civil remedy consistent with the statutory
 scheme, we conclude that the redistricting statutes provide a
 private right of action.
 
 11
 
          C.
 Standing
 
 
          ¶23
 The Board asserts that the Voters don't have standing
 because they haven't suffered a "concrete harm"
 and have made only "generalized grievances."
 See Hickenlooper v. Freedom from Religion Found.,
 Inc., 2014 CO 77, ¶ 9, 338 P.3d 1002, 1006-07
 (noting that neither an "overly 'indirect and
 incidental'" injury nor the "remote possibility
 of a future injury" convey standing (quoting
 Ainscough v. Owens, 90 P.3d 851, 856 (Colo. 2004))).
 Again, we disagree.
 
 
          ¶24
 Standing is a jurisdictional requirement. Ainscough,
 90 P.3d at 855. To establish standing, a plaintiff must show
 that "the plaintiff suffered (1) an injuryin-fact, (2)
 to a legally protected interest." Id.
 Organizations have standing to sue if their individual
 members have standing to sue. Colo. Union of Taxpayers
 Found. v. City of Aspen, 2018 CO 36, ¶ 10, 418 P.3d
 506, 510.
 
 
          ¶25
 The injury-in-fact prong asks whether there's a
 "'concrete adverseness which sharpens the
 presentation of issues' that parties argue to the
 courts." City of Greenwood Vill. v. Petitioners for
 Proposed City of Centennial, 3 P.3d 427, 437 (Colo.
 2000) (quoting Baker v. Carr, 369 U.S. 186, 204
 (1962)); accord Ainscough, 90 P.3d at 856.
 Injury-in-fact includes the deprivation of legal rights.
 Ainscough, 90 P.3d at 856.
 
 
          ¶26
 The legally-protected-interest prong asks "whether the
 plaintiff has a claim for relief under the constitution, the
 common law, a statute, or a rule or
 
 12
 
 regulation." Id. Such an interest includes
 "having a government that acts within the boundaries of
 our state constitution," and it "encompass[es] all
 rights arising from constitutions, statutes, and case
 law." Id. As with the private-right-of-action
 analysis, this prong ensures that "the injury is
 actionable." Denver Health &Hosp. Auth.,
 ¶¶ 20-21, 403 P.3d at 613-14 ("When a statute
 does not specify what constitutes an actionable injury, we
 look to the law of implied private rights of action to
 determine whether the statute might still create a claim
 conferring standing.").
 
 
          ¶27
 Here, the Board deprived the Voters of the procedural
 protections afforded by the redistricting statutes. That is
 an injury-in-fact. See Ainscough, 90 P.3d at 856.
 And, as set forth above, the Voters have an implied private
 right of action under the redistricting statutes. This right
 is an actionable, legally protected interest. See
 Cloverleaf Kennel Club, Inc. v. Colo. Racing Comm'n,
 620 P.2d 1051, 1058 (Colo. 1980) (noting, in the context of
 the Administrative Procedure Act, that "the law of
 implied private rights of action furnishes a model for our
 judgment whether the substantive law creates rights the
 invasion of which confers standing").
 
 
          ¶28
 Therefore, the Voters have standing to sue the Board, and we
 turn to the merits.
 
 13
 
          D.
 Home Rule Counties Have a Constitutional Duty to Comply with
 the Redistricting Statutes
 
 
          ¶29
 To set the stage on the merits, we first address whether home
 rule counties are exempt from the requirements of the
 redistricting statutes. The Board argues that because the
 General Assembly "cannot prohibit the exercise of
 constitutional home rule powers," Town of Telluride
 v. San Miguel Valley Corp., 185 P.3d 161, 170 (Colo.
 2008), home rule counties aren't subject to the
 redistricting statutes.
 
 
          ¶30
 To assess this claim, we must examine its constitutional
 underpinnings.[2]The Colorado Constitution vests the
 registered electors of each county with "the power to
 adopt a home rule charter establishing the organization
 and structure of county government consistent with this
 article and statutes enacted pursuant hereto." Colo.
 Const. art. XIV, § 16(1) (emphasis added). And while
 home rule counties are "empowered to provide such
 permissive functions, services, and facilities and
 to exercise such permissive powers as may be authorized by
 statute . . . except as may be otherwise prohibited or
 limited by charter or this constitution," id.
 at § 16(4) (emphasis added), they are still obliged to
 comply with
 
 14
 
 any "mandatory county functions"
 required by statute, id. at § 16(3) (emphases
 added). The redistricting statutes employ mandatory, not
 permissive, language. For example, "[t]he board . . .
 must designate a county commissioner district
 redistricting commission," § 30-10-306.1(1)
 (emphasis added), and "[t]he commission shall
 not vote upon a final plan until at least seventy-two
 hours after it has been proposed," § 30-10-306.2(2)
 (emphasis added). So, for purposes of this analysis, we must
 distinguish matters that go to the "organization and
 structure" of county government from those that go to
 its "mandatory . . . functions." See Colo.
 Const. art. XIV, § 16(1), (3).
 
 
          ¶31
 The Board points to Board of County Commissioners v.
 Andrews, 687 P.2d 457, 459 (Colo.App. 1984), to support
 its position that home rule counties aren't subject to
 the redistricting statutes. In Andrews, a division
 of the court of appeals observed that "home rule
 counties are given broad discretion in the area of
 structure." Id. The division held that the home
 rule county's charter provision establishing the
 personnel system for the sheriff's office superseded the
 state statute governing the county sheriff's authority to
 hire and fire. Id. The division reasoned that the
 personnel system related to the "structure and
 organization of county government, not to the functions of
 that government." Id.
 
 
          ¶32
 The Board analogizes the personnel system in Andrews
 to the redistricting process in Weld County's Charter,
 asserting that it may draw redistricting maps
 
 15
 
 on its own terms because this activity likewise falls under
 the county's "organization and structure."
 We're unpersuaded.
 
 
          ¶33
 The Andrews division described actions that fall
 within county structure as those "creating . . . a frame
 of government, designating county officials, and establishing
 their relative duties within the county
 government." Id. (emphasis added). On the other
 hand, it observed that "[i]n terms of the functions . .
 . the constitution is much more restrictive. A home
 rule county must do the things that all counties
 must do and must provide the services all counties
 must provide." Id. at 458 (emphases added). So,
 Andrews acknowledged that the Colorado Constitution
 limits home rule counties' authority to determine the
 functions it must carry out.
 
 
          ¶34
 In distinguishing between structure and function, dictionary
 definitions are also instructive. See Eason, 18 P.3d
 at 1276 (construing words and phrases according to their
 commonly accepted meanings). Black's Law Dictionary
 defines "structure" as "[t]he organization of
 elements or parts," such as "corporate
 structure." Structure, Black's Law
 Dictionary (12th ed. 2024). Conversely, "function"
 is defined as "[o]ffice; duty; the occupation of an
 office." Function, Black's Law Dictionary
 (12th ed. 2024). And while not directly on point, the
 definition of "municipal function" is also helpful
 as we consider these terms in the county government context:
 "[t]he duties and responsibilities that a municipality
 owes its members." Municipal function,
 Black's Law Dictionary (12th ed. 2024).
 
 16
 
          ¶35
 Taken together, these definitions support the
 Andrews division's understanding of these terms:
 "structure" relates to the internal organization of
 parts, such as personnel rules, which home rule counties are
 constitutionally empowered to establish, whereas
 "function" relates to the duties a home rule county
 must carry out, a power that is constrained by the
 constitution and curtailed by statute. Colo. Const. art. XIV,
 § 16(1), (3). In other words, structure refers to
 how a county conducts its internal affairs, and
 function refers to what a county government is
 obliged to do for its citizens.
 
 
          ¶36
 Applying that interpretation here, the Board's
 redistricting duties appear to fall into the county's
 "function." The statutes' requirements, such as
 "designat[ing] a county commissioner district
 redistricting commission," § 30-10-306.1(1);
 providing "meaningful and substantial opportunities for
 county residents to present testimony," §
 30-10-306.2(3)(b); and making "a good-faith effort to
 achieve mathematical population equality between
 districts," § 30-10-306.3(1)(a), to name a few, all
 represent duties and responsibilities that a board of county
 commissioners owes its citizens throughout this process. By
 contrast, these requirements don't tell the
 Board how to frame its internal organization or how the
 individual members of the Board work together and arrange
 duties once elected, which would go to the county's
 structure.
 
 17
 
          ¶37
 For these reasons, we conclude that the Board's duty to
 draw and adopt redistricting maps according to the
 redistricting statutes relates to the county's
 function, not the county's structure. And
 because the Colorado Constitution requires home rule counties
 to carry out statutorily mandated functions, home rule
 counties, like Weld, must comply with the redistricting
 statutes.[3]
 
 
          E.
 Remedy
 
 
          ¶38
 Having determined that Weld County must comply with the
 redistricting statutes, we turn to the question of
 when it must do so. The district court enjoined the
 Board's use of the map in question, but it also allowed
 the Board to use the previous map (the one in use before the
 March 1, 2023 resolution) if it couldn't adopt a new map
 in time for the next election.
 
 18
 
          ¶39
 Section 30-10-306.4(1) requires a board of county
 commissioners to "adopt a [final redistricting] plan . .
 . no later than September 30 of the redistricting year."
 A board "may not revise or alter county commissioner
 districts, beyond making de minimis revisions or alterations,
 unless the board of county commissioners makes such revisions
 or alterations during a redistricting year in accordance with
 a final redistricting plan pursuant to section
 30-10-306.4." § 30-10-306.1(3). A
 "[r]edistricting year" is the second odd-numbered
 year after the "federal decennial census." §
 30-10-306(6)(h). In this case, the census year was 2020, so
 the redistricting year was 2023.
 
 
          ¶40
 The Board asserts that, even if it must follow the
 redistricting statutes, section 30-10-306.1(3) prohibits it
 from redistricting until 2033-the second odd-numbered year
 after the next federal census. We disagree.
 
 
          ¶41
 The Board's position would fail to effectuate the
 legislative intent of the redistricting statutes and lead to
 an absurd result for at least two reasons. See
 Eason, 18 P.3d at 1276 (avoiding constructions that lead
 to absurd results).
 
 
          ¶42
 First, the previous map, adopted in 2015, relied on
 2010 census data. The Board admitted that it undertook its
 2023 map-drawing process due to Weld County's rapid
 population growth. If the Board is permitted to use the 2015
 map, Weld County's commissioner districts would be based
 on 2010 census data until 2033. This result would be
 inconsistent with certain goals of the statute: that once
 
 19
 
 a decade the Board "[m]ake a good-faith effort to
 achieve mathematical population equality between
 districts," § 30-10-306.3(1)(a), while preserving
 communities of interest and political subdivisions, §
 30-10-306.3(2)(a). Moreover, the 2015 map wasn't drawn
 and approved according to the redistricting statutes enacted
 in 2021, so its use wouldn't remedy the injury to the
 Voters (namely, the Voters' legally protected right to
 have the maps drawn in compliance with those statutes). Using
 a map based on outdated population data that was drawn before
 the current statutory protections were put in place would
 conflict with the Board's statutory duties.
 
 
          ¶43
 Second, if no remedy is available until the
 next statutory redistricting year in 2033, the Board
 could simply hold out, violate the statute again in ten
 years, and wait out the next decade until the following
 census year. (Even if this Board wouldn't do so,
 the point remains that a board could.) There would
 potentially be no meaningful relief from the injury to the
 Voters' legal right to have their county commissioner
 redistricting maps drawn in accordance with the statutory
 requirements. This would create an absurd loophole.
 
 
          ¶44
 Therefore, we order the Board to draw and approve a new
 county commissioner district map in compliance with the
 redistricting statutes and to do so in time for that map to
 be used in the 2026 county commissioner election.
 
 20
 
          IV.
 Conclusion
 
 
          ¶45
 We reverse that portion of the district court's order
 permitting the Board to use the 2015 map, but we otherwise
 affirm its order granting summary judgment in favor of the
 Voters. Because the Board may no longer use the 2015 map, we
 remand the case to the district court with instructions to
 order the Board to complete the county commissioner
 redistricting process in accordance with Colorado's
 redistricting statutes in time for the 2026 Weld County
 Commissioner Election.
 
 
           CHIEF
 JUSTICE MARQUEZ concurred in the judgment.
 
 21
 
           CHIEF
 JUSTICE MARQUEZ, concurring in the judgment.
 
 
          ¶46
 I agree with the result the majority reaches today. I further
 agree that the Voters[1] have standing and that the
 Board[2] has a legal duty to comply with the
 redistricting statutes, sections 30-10-306.1 to -306.4,
 C.R.S. (2024). I write separately, however, because I would
 construe the Voters' request to order the Board to comply
 with the redistricting statutes as a request for mandamus
 relief. This construction is important for two reasons.
 
 
          ¶47
 First, the majority never explains this court's authority
 to order the Board to comply with the redistricting statutes.
 Generally, courts do not enjoin legislative bodies, such as
 the Board, absent "extraordinary circumstances."
 Markwell v. Cooke, 2021 CO 17, ¶ 19, n.6, 482
 P.3d 422, 426 n.6 (quoting Lewis v. Denver City
 Waterworks Co., 34 P. 993, 995 (Colo. 1893)). Although
 injunctive relief is typically deployed to prevent harm or
 maintain the status quo, the majority does not cite to any
 Colorado precedent justifying a court's reliance on an
 injunction to compel a legislative body to carry out an
 affirmative act.
 
 22
 
          ¶48
 By contrast, courts have traditionally used mandamus relief
 to compel a public official or governmental body to perform a
 duty required by law. See Bd. of Cnty. Comm'rs v.
 Cnty. Rd. Users Ass'n, 11 P.3d 432, 437 (Colo.
 2000); see also Marbury v. Madison, 5 U.S. (1
 Cranch) 137, 149 (1803). That is precisely the relief that
 the Voters ask for here: an order directing the Board to
 conduct a redistricting process pursuant to the redistricting
 statutes. Moreover, both this court and the district court
 have the express authority to issue writs of mandamus. Colo.
 Const. art. VI, §§ 3, 9(1); C.R.C.P. 106(a)(2).
 Although the parties' arguments regarding the
 applicability of C.R.C.P. 106(a)(4) overlooked the district
 court's power of mandamus under C.R.C.P. 106(a)(2), that
 does not mean the court's power does not exist. Nor does
 the parties' oversight absolve us of the responsibility
 to assure ourselves of the court's authority to act.
 
 
          ¶49
 Second, and relatedly, I am concerned with the majority's
 unnecessary reliance on Allstate Insurance Co. v.
 Parfrey, 830 P.2d 905, 911 (Colo. 1992), to find an
 implied right of action here. The Parfrey test
 applies to implied claims for damages, particularly in the
 tort context. But the Voters here seek neither damages nor
 relief in tort. Rather, the Voters seek to compel government
 officials to perform various duties plainly imposed by the
 redistricting statutes.
 
 
          ¶50
 Again, construing the Voters' request for an order
 directing compliance as a request for mandamus relief
 resolves this tension. I see no need to stretch
 Parfrey
 
 23
 
 to fit the circumstances of this case when the Voters'
 complaint clearly meets the requirements for mandamus relief.
 See C.R.C.P. 106(a)(2) (abolishing the special
 pleading requirements for mandamus claims). Further, by
 relying on Parfrey, today's decision injects
 uncertainty and confusion into Colorado's case law on
 mandamus.
 
 
          ¶51
 For these reasons, I respectfully concur only in the
 judgment.
 
 
          I.
 Authority to Grant Relief
 
 
          ¶52
 The majority suggests that unless this court can compel the
 Board to redraw its county districts before the next federal
 census, the legislative intent of the redistricting statutes
 would be thwarted-leading to an absurd result. Maj. op.
 ¶ 41. But the majority does not identify the source of
 any court's authority to order the Board to undertake the
 redistricting process, particularly now, outside of statutory
 deadlines. Identifying the source of such authority is
 important because directing a legislative body to take
 specific action raises significant separation of powers
 concerns. See Grossman v. Dean, 80 P.3d 952, 961
 (Colo.App. 2003) ("A request that the court enjoin
 conduct by the legislature generally entails an improper
 intrusion into legislative affairs." (citing Colo.
 Common Cause v. Bledsoe, 810 P.2d 201, 210 (Colo.
 1991))).
 
 
          ¶53
 Courts in other jurisdictions have grounded their authority
 to compel redistricting in specific language in their
 constitutions. See Hoffmann v. N.Y. State Indep.
 Redistricting Comm'n, 234 N.E.3d 1002, 1012 (N.Y.
 2023)
 
 24
 
 (relying on a constitutional provision expressly allowing
 courts to "order the adoption of, or changes to, a
 redistricting plan as a remedy for a violation of law"
 (quoting N.Y. Const. art. III, § 4(e))). And no
 comparable language exists in the redistricting statutes at
 issue here.
 
 
          ¶54
 However, there is no question that Colorado district courts
 have the constitutional authority to "compel performance
 by public officials of a plain legal duty" by issuing a
 writ of mandamus. Cnty. Rd. Users Ass'n, 11 P.3d
 at 437; see also C.R.C.P. 106(a)(2); Colo. Const.
 art. VI, §§ 3, 9(1). It is that power that
 justifies the order here directing the Board to comply with
 its duties under the redistricting statutes.
 
 
          II.
 Right of Action
 
 
          ¶55
 Construing the Voters' request as one for mandamus relief
 also avoids concerns raised by the majority's
 inappropriate reliance on the Parfrey test.
 
 
          A.
 Parfrey
 
 
          ¶56
 In Parfrey, this court asked "whether a private
 tort remedy is available against a nongovernmental defendant
 for violating a statutory duty." 830 P.2d at 911.
 Parfrey's implied-private-right-of-action test
 was thus developed in the tort context, and its factors
 reflect that aim. For example, Parfrey's first
 factor asks "whether the plaintiff is within the class
 of persons intended to be benefitted by
 
 25
 
 the legislative enactment." Id. This factor
 reflects the duty element of a negligence claim, which in the
 case of nonfeasance asks whether there is a special
 relationship between two individuals or classes of persons.
 Bittle v. Brunetti, 750 P.2d 49, 53 (Colo. 1988)
 ("No special relationship exists between the plaintiff
 and the defendants in this case or between the class of
 pedestrians using public sidewalks and the class of people
 owning or occupying property abutting public
 sidewalks.").
 
 
          ¶57
 True, this court has since held that "[t]he same
 implied-private-right-of-action analysis applies irrespective
 of the defendant's governmental status." City of
 Arvada ex rel. Arvada Police Dep't v. Denver Health
 &Hosp. Auth., 2017 CO 97, ¶ 24, 403 P.3d 609,
 614. And this court has, in limited instances, relied on
 Parfrey in other contexts. See Taxpayers for
 Pub. Educ. v. Douglas Cnty. Sch. Dist., 2015 CO 50,
 ¶ 23, 351 P.3d 461, 469 (holding that the petitioners
 lacked standing to challenge a taxpayer funded scholarship
 program under Parfrey), cert. granted and
 judgment vacated sub nom. Colo. State Bd. of Educ. v.
 Taxpayers for Pub. Educ., 582 U.S. 951 (2017). But this
 court has never used Parfrey to find an implied
 right of action in a case similar to this one. This case does
 not involve a tort claim. It does not seek damages. It does
 not seek to enjoin a defendant from acting, but
 rather, it seeks an order compelling the defendant
 to act.
 
 26
 
          ¶58
 For these reasons, I would not apply Parfrey here,
 well beyond its original context, particularly when mandamus
 provides the exact relief the Voters seek.
 
 
          B.
 Mandamus Actions
 
 
          ¶59
 This is not the first time county residents have sought to
 compel their board of county commissioners to redraw county
 districts. In Board of County Commissioners v.
 Edwards, 468 P.2d 857, 858 (Colo. 1970), residents of
 Saguache County did just that. When county residents brought
 suit, Saguache County had not redrawn its county districts in
 over forty years. Id. During that period, Colorado
 had enacted statutes requiring county districts to be as
 "equal in population as possible." Id.
 (quoting § 35-3-6, C.R.S. (1963)). The redistricting
 statutes then in effect, as in this case, did not contain any
 express language allowing residents to bring an action to
 enforce their terms. See §§ 35-3-1 to -22,
 C.R.S. (1963). This court nevertheless affirmed the district
 court's judgment requiring the county board of
 commissioners to redraw the districts. Edwards, 468
 P.2d at 859. In doing so, we observed that "[i]t is well
 established that[,] to compel the performance of an act which
 the law specifically enjoins upon public officers as a duty,
 mandamus is the proper and effective remedy."
 Id.
 
 
          ¶60
 A plaintiff seeking mandamus relief must satisfy a three-part
 test: "(1) the plaintiff must have a clear right to the
 relief sought, (2) the defendant must have a clear duty to
 perform the act requested, and (3) there must be no other
 available
 
 27
 
 remedy." Cnty. Rd. Users Ass'n, 11 P.3d at
 437. The Voters' claim meets these requirements.
 
 
          ¶61
 First, the Voters have "a clear right to the relief
 sought." Id. Although some statutes expressly
 allow plaintiffs to bring a mandamus action, see,
 e.g., § 10-3-814(3), C.R.S. (2024), this is not
 necessary for a plaintiff to establish a clear right to
 mandamus relief. See Edwards, 468 P.2d at 858.
 Colorado courts have held that the first element is met when
 the plaintiff is among the intended beneficiaries of the
 public official's legal duty. See id. (holding
 that the residents of Saguache County had a clear right to
 compel the board of county commissioners to redistrict under
 the redistricting statutes). Indeed, under the first and
 second elements for mandamus relief, the plaintiff's
 right to relief and the defendant's duty generally stem
 from the same legal source. Id.
 
 
          ¶62
 Here, the majority correctly notes that in enacting the
 redistricting statutes, the legislature declared, "In
 order for our democratic republic to truly represent the
 voices of the people, districts must be drawn such that the
 people have an opportunity to elect representatives who are
 reflective of and responsive and accountable to their
 constituents." Ch. 70, sec. 1(1)(a), 2021 Colo. Sess.
 Laws 277, 277. The redistricting statutes were thus enacted
 for the people's benefit and to ensure that county
 districts represent their constituents. The Voters, as
 residents
 
 28
 
 of Weld County, thus have a clear right to have districts
 drawn in compliance with the redistricting statutes.
 
 
          ¶63
 Second, the Board has "a clear duty to perform the act
 requested." Cnty. Rd. Users Ass'n, 11 P.3d
 at 437. This second requirement "compel[s] the
 performance of a purely ministerial duty involving no
 discretionary right and not requiring the exercise of
 judgment." Id. The use of mandatory language,
 such as "shall" or "must," signals that
 the law is intended to impose "a mandatory duty and not
 suggest merely a permissive or discretionary act."
 Edwards, 468 P.2d at 859.
 
 
          ¶64
 The redistricting statutes contain several non-discretionary,
 ministerial duties. For example, county boards
 "must designate a county commissioner district
 redistricting commission," § 30-10-306.1(1), C.R.S.
 (2024) (emphasis added), and they "shall
 appoint staff as needed to assist the commission,"
 § 30-10-306.2(1), C.R.S. (2024) (emphasis added).
 Redistricting commissions, in turn, "shall . .
 . [m]ake a good-faith effort to achieve mathematical
 population equality between districts" and
 "[c]omply with the federal 'Voting Rights Act of
 1965,' 52 U.S.C. sec. 10301." §
 30-10-306.3(1)(a), (b), C.R.S. (2024) (emphasis added). They
 also "[a]s much as is reasonably possible . . . must
 preserve whole communities of interest and whole political
 subdivisions, such as cities and towns," and "to
 the extent reasonably possible, maximize the number of
 politically competitive districts." §
 30-10-306.3(2)(a), (3)(a). Finally, county boards
 "must"
 
 29
 
 create "a website and a method for county residents to
 present testimony," submit "not less than three
 plans for county commissioner districts," publish the
 plans online, and have "[t]hree public hearings on the
 plans." § 30-10-306.4(c)-(f), C.R.S. (2024). These
 duties of the Board are non-discretionary.
 
 
          ¶65
 Third, the Voters have "no other available remedy."
 Cnty. Rd. Users Ass'n, 11 P.3d at 437.
 "[M]andamus will not issue until all forms of
 alternative relief have been exhausted." Gramiger v.
 Crowley, 660 P.2d 1279, 1281 (Colo. 1983). Such
 alternative relief can take several forms, including common
 law and statutory actions. Julesburg Sch. Dist. No. RE-1
 v. Ebke, 562 P.2d 419, 421 (Colo. 1977) (denying
 mandamus relief when a contract claim was available);
 Dep't of Revenue v. Dist. Ct., 802 P.2d 473, 477
 (Colo. 1990) (denying mandamus relief when the Administrative
 Procedure Act provided relief).
 
 
          ¶66
 As in Edwards, the redistricting statutes at issue
 here do not specify a remedy for noncompliance. Nor was
 there, before today's opinion, any other statutory or
 common law action that the Voters could have brought to
 compel the Board to act. Because I reject the majority's
 reliance on Parfrey, I would hold that the Voters
 lacked an alternative, available remedy. And thus, with all
 three requirements met, I would hold that the Voters are
 entitled to mandamus relief.
 
 
          ¶67
 The fact that the Voters did not expressly seek mandamus
 relief does not preclude such relief because C.R.C.P. 106(a)
 abolished the special pleading
 
 30
 
 requirements for mandamus actions. Further, the district
 court's order on appeal ruled on the Board's motion
 to dismiss and the Voters' motion for summary judgment.
 To the extent the district court was ruling on the
 Board's motion to dismiss, the exact theory of relief
 pled by the Voters is not important. Pleadings are construed
 to do substantial justice, and what matters is that the
 pleaded facts entitle the plaintiff to relief under the law.
 C.R.C.P. 8(e)(2); Spomer v. City of Grand Junction,
 355 P.2d 960, 963 (Colo. 1960). As the majority notes, it is
 undisputed that the Board failed to follow the redistricting
 statutes. Maj. op. ¶ 5. And to the extent the district
 court granted summary judgment on the Voters' claim, this
 court can affirm a judgment based on any ground supported by
 the record, whether or not it was considered by the trial
 court. Laleh v. Johnson, 2017 CO 93, ¶ 24, 403
 P.3d 207, 212.
 
 
          ¶68
 And we are not precluded from construing the Voters'
 claim as a mandamus action given the procedural posture of
 this case. Requests for mandamus relief have come before this
 court via original proceedings and certiorari review.
 Meredith v. Zavaras, 954 P.2d 597, 601 (Colo. 1998)
 (addressing mandamus relief under C.A.R. 21 jurisdiction);
 Cnty. Rd. Users Ass'n, 11 P.3d at 434
 (addressing mandamus relief under certiorari jurisdiction).
 
 31
 
          C.
 The Impact of Today's Decision on Mandamus
 Jurisprudence
 
 
          ¶69
 Today's decision injects confusion and uncertainty into
 our mandamus jurisprudence. As mentioned, mandamus actions
 can only be brought if there is no alternative remedy
 available. Cnty. Rd. Users Ass'n, 11 P.3d at
 437. But today's decision suggests that a government
 official can be compelled to act via an implied right of
 action under Parfrey. If so, there will always be
 alternative remedies for claims that would otherwise qualify
 for mandamus relief, effectively eliminating plaintiffs'
 ability to bring mandamus actions. Today's decision thus
 undermines over 150 years of Colorado's mandamus
 precedent. See, e.g., Deitz v. City of
 Cent., 1 Colo. 323, 332 (1871).
 
 
          ¶70
 This result is concerning. Because the Parfrey test
 was designed to address implied claims for damages in the
 tort context, its factors do not reflect many of the nuances
 that have developed in the mandamus context. For example,
 under Parfrey, there is no requirement that the
 compelled official act be non-discretionary. It would appear
 that future plaintiffs could rely on today's decision to
 argue that the Parfrey test authorizes them to ask
 courts to compel otherwise discretionary acts by government
 officials. Additionally, the Parfrey analysis does
 not ask whether the plaintiff has an available remedy.
 Today's decision would suggest that litigants can now
 circumvent alternative remedies, such as administrative or
 common law claims, and instead seek injunctions against
 
 32
 
 government officials. Even if the majority believes that
 Parfrey can deal with these problems, I fear
 today's opinion inadvertently gives rise to new legal
 issues that could be easily avoided.
 
 
          III.
 Conclusion
 
 
          ¶71
 In sum, to avoid separation of powers concerns and to resolve
 this case in line with longstanding precedent, I would
 construe the Voters' request to order the Board to comply
 with the redistricting statutes as a request for mandamus
 relief.
 
 
          ¶72
 Accordingly, I respectfully concur only in the judgment.
 
 
 ---------
 
 
 Notes:
 
 
 [1] We granted certiorari to review the
 following five issues:
 
 
 1. Whether the trial court erred in concluding that
 section 30-10-306, et seq., C.R.S. (2023), implies a private
 right of action.
 
 
 2. Whether the trial court erred in concluding that
 plaintiff-appellants had standing to sue the Board based on
 nothing more than generalized grievance constituting pure
 procedural irregularities.
 
 
 3. Whether the trial court erred in concluding as a
 matter of law that section 30-10-306, et seq., applies to a
 home rule county with a conflicting charter.
 
 
 4. Whether the trial court erred in determining there
 is no conflict between the provisions of section 30-10-306,
 et seq., and the Weld County home rule charter.
 
 
 5. Whether the Board must be directed to engage in a
 county commissioner redistricting process that complies with
 the redistricting statutes for future elections.
 
 
 [2] Of course, "[a] county is not an
 independent governmental entity existing by reason of any
 inherent sovereign authority of its residents; rather, it is
 a political subdivision of the state," and "as
 such, [a county] possesses only those powers expressly
 granted by the constitution or delegated to it by
 statute." Romer v. Bd. of Cnty. Comm'rs,
 897 P.2d 779, 782 (Colo. 1995) (first quoting Bd. of
 Cnty. Comm'rs v. Love, 470 P.2d 861, 862 (Colo.
 1970); and then quoting Pennobscot, Inc. v. Bd. of Cnty.
 Comm'rs, 642 P.2d 915, 918 (Colo. 1982)).
 
 
 [3] The Board asserts that Weld
 County's Charter conflicts with the statutes and that the
 Board must follow the Charter. The Voters counter that the
 Charter and the redistricting statutes are not materially
 different and that the Charter itself requires the county to
 comply with the redistricting statutes. Because we conclude
 that the statutes supersede a home rule county's charter,
 this issue is moot, and we don't address it.
 
 
 Additionally, because the redistricting statutes
 contain an implied right of action, there's no separation
 of powers concern. See Colo. Const. art. III
 ("[N]o person or collection of persons charged with the
 exercise of powers properly belonging to one of these
 [legislative, executive, and judicial] departments shall
 exercise any power properly belonging to either of the
 others."). Today, we order the Board to perform duties
 that the General Assembly already mandated and that the
 Constitution doesn't allow the Board to ignore.
 
 
 [1] Like the majority, I refer
 collectively to Weld County residents Stacy Suniga and
 Barbara Whinery; the League of Women Voters of Greeley, Weld
 County, Inc.; and the Latino Coalition of Weld County as the
 "Voters." Maj. op. ¶ 2.
 
 
 [2] Like the majority, I refer to the
 Board of County Commissioners of the County of Weld as the
 "Board." Maj. op. ¶ 1.
 
 
 ---------